Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BARRY CARUSO, derivatively on behalf of WORKHORSE GROUP INC.,

Plaintiff,

v.

DUANE A. HUGHES, STEVE SCHRADER, RAYMOND CHESS, GERALD B. BUDDE, H. BENJAMIN SAMUELS, HARRY DEMOTT, MICHAEL L. CLARK, PAMELA S. MADER, and JACQUELINE A. DEDO,

Defendants,

and

WORKHORSE GROUP INC.,

Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **INTRODUCTION**

Plaintiff Barry Caruso ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Workhorse Group Inc. ("Workhorse" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Duane A. Hughes ("Hughes"), Steve Schrader ("Schrader"), Raymond Chess ("Chess"), Gerald B. Budde ("Budde"), H. Benjamin Samuels ("Samuels"), Harry DeMott ("DeMott"), Michael L. Clark ("Clark"), Pamela S. Mader ("Mader"), and Jacqueline A. Dedo ("Dedo") (collectively, the "Individual Defendants," and together with Workhorse, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Workhorse, unjust enrichment, waste of corporate assets, violation of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Workhorse, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Workhorse's directors and officers from July 7, 2020 through February 23, 2021 (the "Relevant Period").

2.      Workforce is an Ohio-based electric vehicle manufacturer. Specifically, the Company focuses on the production of all battery-electric delivery vehicles and drone systems designed for last-mile delivery. Although the Company was founded in November 2007 and began operations in December 2009, since inception the business has struggled to turn profitable (or even break-even) as it has incurred net losses each year resulting in a sizeable accumulated deficit of approximately $109 million.

3.      While struggling to get off the ground financially and operationally—as of March 2021, the Company had failed to ramp up production to even three vehicles per day—and in search of a "game-changer"[1] as Defendant Hughes characterized it, Workhorse threw its hat into the ring for a lucrative contract with the United States Postal Service ("USPS"), which had been estimated to be worth up to $6.3 billion.

4.      The USPS maintains one of the largest civilian delivery vehicle fleets in the world. However, the majority of its more than 200,000 delivery vehicles were built decades ago and therefore lack basic functions such as air-conditioning or air bags and are also near or have exceeded their service life. As a result, for years the USPS has been experiencing vehicle breakdowns with increasing frequency and suffering from exorbitant maintenance costs and safety issues associated with its aging fleet.

5.      Despite facing serious budgetary pressures and widely reported financial issues that largely stem from a December 2006 act of Congress, the USPS announced its Next Generation Delivery Vehicles program in January 2015, a multi-year process intended to replace its long life vehicles that had been in service for more than two decades.

6.      Throughout the Relevant Period, the Individual Defendants caused the Company to consistently make statements through the Company's official social media, namely, its Twitter account, regarding the likelihood of securing the USPS contract for its

---

[1] https://www.theverge.com/2021/3/1/22307333/workhorse-usps-mail-truck-contract-oshkosh. (last visited April 16, 2021).

Next Generation Delivery Vehicles program and also in the Company's SEC filings declaring Workhorse's internal controls to be effective. Specifically, in a series of interviews leading up to the announcement of the winner of the USPS contract, Defendants Hughes and Schrader repeatedly added fuel to the speculation that the Company was going to be selected for the USPS contract since it was the only U.S.-based electric vehicle suitor remaining. For example, in an interview with financial news publication *Benzinga*, Defendant Schrader touted the Company's "all electric" delivery vehicle as "perfect" for the USPS and gassed up President Joseph R. Biden's endorsement of electric vehicles stating that his announcement was "huge" and a "very good thing" during an interview with a popular finance YouTuber. In reality, however, Workhorse had no indication that it would be awarded the USPS contract and in fact the USPS did not have the capital necessary to electrify more than just a very small portion of its fleet. The statements made by Defendants Hughes and Schrader during these interviews and the Company's Tweets throughout the Relevant Period repeatedly failed to provide investors with that dose of reality. Instead, the Individual Defendants pumped up the stock on materially false and misleading statements and omissions while six of the Individual Defendants engaged in lucrative insider sales collectively valued at $62.3 million.

7.    The truth was revealed to the public on February 23, 2021, when the USPS issued a press release announcing that it had awarded a 10-year contract to Oshkosh Defense (and not Workhorse) to manufacture a new generation postal delivery vehicle.

8.    On this news, the price of the Company's stock dropped from $31.34 per share at the close of trading on February 22, 2021, to $16.47 at the close of trading on February 23, 2020, a staggering drop of $14.87, or approximately 47.4%. Further, the price of the Company's stock continued to fall in after-hour trading, opening at $14.07 per share on February 24, 2021, an additional drop of $2.40, or approximately 14.6%. In

total, from the market's close on February 22, 2021 to its opening on February 24, 2021, the Company's stock dropped $17.27, or approximately 55.1%.

9.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Workhorse's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Workhorse was merely hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (2) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

10.   The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.   Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.   Furthermore, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $62.3 million.

13.   In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities

Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Workhorse's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because Workhorse and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Workhorse common stock. Plaintiff has continuously held Workhorse common stock at all relevant times.

### Nominal Defendant Workhorse

24.     Workhorse is a Nevada corporation with its principal executive offices located at 100 Commerce Drive, Loveland, Ohio 45140. Workhorse's shares trade on The NASDAQ Capital Market ("NASDAQ") under the ticker symbol "WKHS."

### Defendant Hughes

25.     Defendant Hughes has served as the Company's CEO and as a Company director since February 2019.[2] Previously, he served as the Company's Chief Operating

---

[2] Although the 2020 10-K states that Defendant Hughes has served in these roles since November 2019, the Company's current report filed with the SEC on Form 8-K on February 5, 2019 stated that Defendant Hughes' appointment as CEO and a member of the Board was effective February 4, 2019.

Verified Shareholder Derivative Complaint

Officer and President from August 2016 until January 2019. According to the Company's annual report for the year ended December 31, 2020 filed with the SEC on Form 10-K on March 1, 2021 (the "2020 10-K"), as of February 15, 2021, Defendant Hughes beneficially owned 1,296,085 shares of the Company's common stock, which represented 1.0% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Hughes owned approximately $46.9 million worth of Workhorse stock.[3]

26.     For the fiscal year ended December 31, 2020, Defendant Hughes received $1,334,750 in compensation from the Company. This included $475,000 in salary, $475,000 in stock awards, and $384,750 in non-equity incentive plan compensation.

27.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hughes made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 13, 2020 | 62,513 | $16.46 | $1,028,963.98 |
| September 17, 2020 | 50,000 | $25.78 | $1,289,000.00 |
| October 16, 2020 | 50,000 | $23.00 | $1,150,000.00 |
| December 15, 2020 | 55,989 | $21.61 | $1,209,922.29 |
| January 4, 2021 | 25,000 | $20.73 | $518,250.00 |
| January 7, 2021 | 100,000 | $25.00 | $2,500,000.00 |
| January 26, 2021 | 200,000 | $29.00 | $5,800,000.00 |
| February 1, 2021 | 25,000 | $35.97 | $899,250.00 |

Thus, in total, before the fraud was exposed, he sold 568,502 Company shares on inside information, for which he received approximately $14.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and

---

[3] The market was closed on Monday, February 15, 2021 for President's Day.

7

omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

28.     The 2020 10-K stated the following about Defendant Hughes:

Mr. Hughes is a senior-level executive with more than 20 years' experience including direct business relationships in the automotive, advertising, and technology segments. Mr. Hughes has served as our Chief Executive Officer and as a director since November 2019. Prior to Mr. Hughes' appointment as Chief Executive Officer, Mr. Hughes served as Chief Operating Officer and President of Workhorse from August 2016 through January 2019. Prior to joining Workhorse, Mr. Hughes served as Chief Operating Officer for Cumulus Interactive Technologies Group. As Chief Operating Officer, Mr. Hughes was responsible for managing the company's day-to-day sales and operations. He was responsible for all operations of the business unit. Prior to Cumulus Interactive Technologies Group, Mr. Hughes spent nearly fifteen years in senior management positions with Gannett Co., Inc., including his duties as Vice President of Sales and Operations for Gannett Media Technologies International. We believe that Mr. Hughes possesses specific attributes that qualify him to serve as a member of the Board, including the perspective and experience he brings as our Chief Executive Officer, including his historic knowledge, operational expertise, and continuity to the Board.

29.     Upon information and belief, Defendant Hughes is a citizen of Ohio.

**Defendant Schrader**

30.     Defendant Schrader has served as the Company's CFO since December 2019. According to the 2020 10-K, as of February 15, 2021, Defendant Schrader beneficially owned 160,361 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Schrader owned approximately $5.8 million worth of Workhorse stock.

31.     Pursuant to an employment agreement dated December 19, 2019, for the fiscal year ended December 31, 2020, *inter alia*, Defendant Schrader was entitled to at least $275,000 in base salary which would automatically increase to $300,000 upon the filing of certain quarterly reports with the SEC following the year ended December 31,

2020. Moreover, Defendant Schrader was entitled to a cash bonus as determined by the Compensation Committee based upon the level of achievement of certain performance goals. Specifically, his target bonus would be 50% of his base salary with the potential to receive up to 75% of his base salary. Further, Defendant Schrader was entitled to $275,000 in equity awards and was eligible to receive additional equity incentive grants subject to certain conditions.

32.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schrader made the following sale of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| December 14, 2020 | 15,152 | $21.92 | $332,131.84 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The 2020 10-K stated the following about Defendant Schrader:

Mr. Schrader has over sixteen years of experience in public and private companies in industries such as manufacturing, health care and utilities and is currently serving as our Chief Financial Officer. Prior to his appointment by the Company, from December 2015 to December 2019, Mr. Schrader was Chief Financial Officer of Fuyao Glass America Inc., a subsidiary of a Chinese-owned public company specializing in the manufacture of automobile glass. From October 2006 to May 2015, Mr. Schrader served as the Chief Financial Officer of Oncology Hematology Care ("OHC"), the largest oncology practice in the Cincinnati metro area. Mr. Schrader started his career working for utilities that are now part of Duke Energy. His last position there was Vice President and Chief Financial Officer of Cinergy's Regulated Business prior to Duke's acquisition in 2006. Mr. Schrader holds a B.S. in Finance and Accounting from Ball State and an MBA from Butler University. He also received an Advanced Management Program Certificate from Harvard Business School.

34.     Upon information and belief, Defendant Schrader is a citizen of Ohio.

**Defendant Chess**

35.     Defendant Chess has served as a Company director since October 2013 and as Chairman of the Board since December 2015. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Chess beneficially owned 141,390 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Chess owned approximately $5.1 million worth of Workhorse stock.

36.     For the fiscal year ended December 31, 2020, Defendant Chess received $135,000 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $70,000 in stock awards.

37.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 15, 2020 | 27,365 | $16.34 | $447,144.10 |
| August 17, 2020 | 4,000 | $15.32 | $61,280.00 |
| September 15, 2020 | 4,000 | $25.41 | $101,640.00 |
| October 15, 2020 | 4,000 | $22.39 | $89,560.00 |
| November 16, 2020 | 4,000 | $19.26 | $77,040.00 |
| December 18, 2020 | 5,000 | $21.05 | $105,250.00 |
| January 7, 2021 | 10,000 | $24.77 | $247,700.00 |
| January 15, 2021 | 4,853 | $24.46 | $118,704.38 |
| February 16, 2021 | 5,000 | $35.98 | $179,900.00 |

38.     Thus, in total, before the fraud was exposed, he sold 68,218 Company shares on inside information, for which he received approximately $1.4 million. His insider sales made with knowledge of material non-public information before the material

misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

39.    The 2020 10-K stated the following about Defendant Chess:

Raymond Chess has 40+ years in the automotive industry. Mr. Chess joined General Motors in 1980, and during his 37 years with General Motors, he held ever increasing roles and responsibilities in both manufacturing and product development. While in manufacturing, Mr. Chess held key positions in both plant floor operations and manufacturing engineering such as Chief Manufacturing Engineer and Executive Director of Stamping and Assembly. While in product development, Mr. Chess was a Vehicle Line Executive, where he led global cross functional responsibilities for GM's commercial truck line from 2001 to 2009 and GM's cross over segment from 2009 through 2012. Upon retirement from General Motors, he formed his own engineering consulting company. In 2014, Mr. Chess was elected onto the Board of Directors of Rush Enterprises. Mr. Chess also sits on the advisory board of Productive Research LLC. He started working with Workhorse in 2014 on their advisory board, was then elected to their Board of Directors and subsequently became the Chairman. We believe that Mr. Chess possesses specific attributes that qualify him to serve as Chairman and a member of our committees, including his lengthy executive experience in the automotive industry and his board experience.

40.    Upon information and belief, Defendant Chess is a citizen of Michigan.

**Defendant Budde**

41.    Defendant Budde has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Budde beneficially owned 214,047 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Budde owned approximately $7.7 million worth of Workhorse stock.

42.    For the fiscal year ended December 31, 2020, Defendant Budde received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

43.    The 2020 10-K stated the following about Defendant Budde:

Verified Shareholder Derivative Complaint

Mr. Budde is currently the Eastern Regions Chief Financial Officer of AssuredPartners, Inc. Mr. Budde started his career in public accounting with EY after graduating with a Bachelor of Science degree in Accounting from the University of Dayton. After almost eleven years with EY as a licensed CPA, Mr. Budde spent over nine years in the machine tool industry with Cincinnati Milacron Inc., Cincinnati Machine, a successor company, and its parent company UNOVA Manufacturing Technologies, as its Vice President of Finance and Administration. Mr. Budde became the Chief Financial Officer at Neace Lukens, an insurance brokerage and consulting firm, in 2003 who was acquired by AssuredPartners in 2011. Prior to his current role, Mr. Budde was previously the Midwest Region Chief Financial Officer overseeing multiple AssuredPartners legal entities. Mr. Budde previously served on the Board of Trustees and the Finance Committee for Mount Notre Dame high school and is a member of the Finance Commission for St Margaret of York parish and school. Mr. Budde's business, management, and accounting knowledge and experience led to the conclusion he should serve on the Board of Directors, given the Company's business and structure. We believe that Mr. Budde possesses specific attributes that qualify him to serve as a member of the Board and as Chair of the Audit Committee, such as his executive leadership experience and his financial and accounting expertise in the public setting.

44.    Upon information and belief, Defendant Budde is a citizen of Ohio.

**Defendant Samuels**

45.    Defendant Samuels has served as a Company director since December 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Samuels beneficially owned 1,460,086 shares of the Company's common stock, which represented 1.2% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Samuels owned approximately $52.8 million worth of Workhorse stock.

46.    For the fiscal year ended December 31, 2020, Defendant Samuels received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

47. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Samuels made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| August 18, 2020 | 500,000 | $16.65 | $8,325,000.00 |
| November 20, 2020 | 99,999 | $25.01 | $2,500,974.99 |
| January 4, 2021 | 99,999 | $20.73 | $2,072,979.27 |
| January 7, 2021 | 99,999 | $26.00 | $2,599,974.00 |
| January 26, 2021 | 299,997 | $30.00 | $8,999,910.00 |

Thus, in total, before the fraud was exposed, he sold 1,099,994 Company shares on inside information, for which he received approximately $24.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

48. The 2020 10-K stated the following about Defendant Samuels:

Mr. Samuels served as CEO of Victory Packaging from May 2007 through 2015, during which time he led an executive team managing more than 1,700 employees. In 2015, Mr. Samuels was appointed as Co-President after Victory Packaging was acquired by KapStone Paper and Packaging Corporation. From 1995 through 2007, Mr. Samuels served in multiple roles, including as Vice Chairman and leader of Victory Packaging's national accounts group, real estate, finance and legal departments, achieving a period of unprecedented growth in sales and revenues. Mr. Samuels is an active member in the community, where he served as the Chairman of the Houston Food Bank and as a director of the Samuels Family Foundation. Samuels serves on the boards of and holds leadership positions with Teach For America, Children at Risk, Brighter Bites, Move For Hunger, American Jewish Committee, Leo Baeck Education Center Foundation, and Jewish Federation of Greater Houston. Mr. Samuels received a Bachelor's Degree in American studies and economics from Amherst College in Massachusetts as well as an MBA from the Harvard Graduate School of Business Administration. We believe that Mr. Samuels possesses specific attributes that qualify him to serve as a member of the Board and a member of our committees, including his deep understanding of

managing and operating significant organizations as an executive and his experience in starting.

49.     Upon information and belief, Defendant Samuels is a citizen of Texas.

**Defendant DeMott**

50.     Defendant DeMott has served as a Company director since September 2016. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 10-K, as of February 15, 2021, Defendant DeMott beneficially owned 27,905 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant DeMott owned approximately $1.0 million worth of Workhorse stock.

51.     For the fiscal year ended December 31, 2020, Defendant DeMott received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

52.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant DeMott made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| September 28, 2020 | 50,000 | $26.14 | $1,307,000.00 |
| December 14, 2020 | 62,450 | $21.92 | $1,368,904.00 |

53.     Thus, in total, before the fraud was exposed, he sold 112,450 Company shares on inside information, for which he received approximately $2.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

54.     The 2020 10-K stated the following about Defendant DeMott:

Mr. DeMott, has more than 25 years of experience in the investment community, having worked as an analyst and portfolio manager at leading

brokerage firms and investment management firms. He has also served on the boards of several companies. He is a long-time operator and investor in the media, sports and entertainment industries. He is the co-founder of Raptor Ventures I LP, where he has been a General Partner since February 2011. In addition, Mr. DeMott is a member of the Board of Directors of Proper (where he also serves as executive Chairman), Hi.Fi, SecurityPoint Media, Australis and Ticket Evolution.

He also serves as founder and managing partner for Hamerle Investments, a family investment company. Prior to co-founding Raptor Ventures, Mr. DeMott served on the Board of Directors of Pandora Media, Inc. from 2006 through 2011. Earlier, he served as senior analyst at Knighthead Capital Management, analyst at King Street Capital Management, portfolio manager at Bourgeon Capital Management and managing member and founder at Gothic Capital Management. During this 16-year period, Mr. DeMott focused on finding, fostering and investing in disruptive technology companies. He previously spent nine years at First Boston (now Credit Suisse), where he was a director in the equity research division specializing in radio, television, outdoor advertising and cell towers. He earned a Bachelor of Arts in economics from Princeton University in 1988 and a MBA in finance from New York University in 1991. We believe that Mr. DeMott possesses specific attributes that qualify him to serve as a member of the Board and a member of our committees, including his deep understanding of the financial markets and his experience in starting and operating various companies.

55.    Upon information and belief, Defendant DeMott is a citizen of New York.

**Defendant Clark**

56.    Defendant Clark has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Clark beneficially owned 120,355 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Clark owned approximately $4.4 million worth of Workhorse stock.

57.     For the fiscal year ended December 31, 2020, Defendant Clark received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

58.     The 2020 10-K stated the following about Defendant Clark:

Mr. Clark is a Chartered Financial Analyst ("CFA") Charterholder with close to twenty years of investing and capital markets experience. He also serves as a director of Laws Whiskey House, a privately held, Denver-based award winning craft distillery. Mr. Clark has also served as a director of Halcón Resources from September 2016 until October 2019 and as a director of Paragon Offshore Ltd., as Chairman of the Corporate Governance and Compensation Committee and a member of its Audit Committee from July 2017 until its sale to Borr Drilling Limited in March 2018. Mr. Clark was a Retired Partner of SIR Capital Management, LLC from 2014 until his departure in 2016 and from 2008 to 2013 served as a Portfolio Manager and Partner. Prior to that, Mr. Clark valued equities as a Portfolio Manager at Satellite Asset Management, LLC from 2005 to 2007 and as an Equity Research Analyst at SAC Capital Management, LLC from 2003 to 2005 and at Merrill Lynch from 1997 to 2002. Mr. Clark began his career at Deloitte & Touche, LLP, progressing to Senior Auditor. He is a Certified Public Accountant licensed in New York State and also holds the Accredited in Business Valuation (ABV) credential awarded by the American Institute of Certified Public Accountants. The National Association of Corporate Directors ("NACD") recognized him as a NACD Governance Fellow in 2017. Mr. Clark graduated cum laude from the University of Pennsylvania with a Bachelor of Arts in Economics and earned a Masters of Business Administration in Finance and Economics with Distinction (top 10%) from New York University's Stern School of Business. Mr. Clark's qualifications to serve on the board include his public company board service and his wealth of accounting, valuation and capital markets experience. We believe that Mr. Clark possesses specific attributes that qualify him to serve as a member of the Board and a member of our committees, including his broad experience in the capital markets, in addition to skills acquired with firms engaged in investment banking and financial services.

59.     Upon information and belief, Defendant Clark is a citizen of New York.

**Defendant Mader**

60.     Defendant Mader has served as a Company director since May 2020. She

also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Mader beneficially owned 3,939 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Mader owned approximately $142,552 worth of Workhorse stock.

61.     For the fiscal year ended December 31, 2020, Defendant Mader received $68,333 in compensation from the Company. This included $33,333 in fees earned or paid in cash and $35,000 in stock awards.

62.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mader made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| November 24, 2020 | 8,000 | $30.00 | $240,000.00 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

63.     The 2020 10-K stated the following about Defendant Mader:

Ms. Mader brings over two decades of automotive industry experience, with a proven track record in leading Fortune 100 manufacturing organizations as well as supporting the growth of emerging growth companies through various business advisory services. Since June 2018, Ms. Mader has served as VP Belcan Consulting Services for Belcan Engineering, Consulting, and Technical Services, LLC. From 2012 through 2018, Ms. Mader held various positions with Allegiant International, LLC. From 1994 through 2010, Ms. Mader held various positions with General Motors including Plant Manager of various General Motors assembly operations. Ms. Mader received a Bachelor of Science, Organizational Leadership from Purdue University and serves as a Board Member for Purdue University, College of Polytechnic. We believe that Ms. Mader possesses specific attributes that qualify her to serve as a member of the Board and a member of our committees, including

17

her lengthy executive experience in the automotive industry.

64.     Upon information and belief, Defendant Mader is a citizen of Indiana.

**Defendant Dedo**

65.     Defendant Dedo has served as a Company director since May 2020. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2020 10-K, as of February 15, 2021, Defendant Dedo beneficially owned 11,939 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Dedo owned approximately $432,072 worth of Workhorse stock.

66.     For the fiscal year ended December 31, 2020, Defendant Dedo received $68,333 in compensation from the Company. This included $33,333 in fees earned or paid in cash and $35,000 in stock awards.

67.     The 2020 10-K stated the following about Defendant Dedo:

Ms. Dedo has over 30 years of global automotive, off highway, industrial and aftermarket experience. She has held various leadership positions at Piston Group, Dana Holding Corp., Motorola, and Robert Bosch Corporation among others and has a proven background in managing full P&L responsibilities for major business units and entire companies responsible for up to $2 billion in revenue. In May 2015, Ms. Dedo co-founded Aware Mobility LLC, which is focused on the development, investing, partnering and application of both electrified propulsion and connectivity tools, platforms and applications. Prior to May 2015, Ms. Dedo served as President of Piston Group and held various positions with Dana Holding Corp, The Timken Company, Motorola, Covisint LLC, Robert Bosch Corporation and Cadillac Motor Car Company. Ms. Dedo received a Bachelor of Science, Electrical Engineering from Kettering University and holds a number of board positions including Cadillac Products, Kettering University and Michigan Science Center. We believe that Ms. Dedo possesses specific attributes that qualify her to serve as a member of the Board and a member of our committees, including her lengthy executive experience in the automotive industry.

68.     Upon information and belief, Defendant Dedo is a citizen of Michigan.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors, and/or fiduciaries of Workhorse and because of their ability to control the business and corporate affairs of Workhorse, the Individual Defendants owed Workhorse and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Workhorse in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Workhorse and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Workhorse and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Workhorse, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Workhorse, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should

have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Workhorse's Board at all relevant times.

74.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.    To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Workhorse were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Ohio, California, and the United States, and pursuant to Workhorse's own Code of Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Workhorse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Workhorse and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Workhorse's operations would comply with all applicable laws and Workhorse's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.     Each of the Individual Defendants further owed to Workhorse and the shareholders the duty of loyalty requiring that each favor Workhorse's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

77.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Workhorse and were at all times acting within the course and scope of such agency.

78.     Because of their advisory, executive, managerial, and directorial positions with Workhorse, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Workhorse.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

82.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who are directors of Workhorse was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

83.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Workhorse and was at all times acting within the course and scope of such agency.

## WORKHORSE'S CODE OF ETHICS

85.    The 2020 Proxy Statement (defined below) states that the Code of Ethics "applies to all of our directors, officers and employees including our Chief Executive Officer and Chief Financial Officer and principal accounting officer."

86.    As a "General Statement of Policy," the Company's Code of Ethics states the following:

• Honesty and candor in our activities, including observance of the spirit, as well as the letter of the law;
• Avoidance of conflicts between personal interests and the interests of the Company, or even the appearance of such conflicts;

* * *

• Compliance with generally accepted accounting principles and controls;
• Maintenance of our reputation and avoidance of activities which might reflect adversely on the Company; and
• Integrity in dealing with the Company's assets.

87.     In a section titled, "Honesty, Candor and Observance of Laws," the Code of Ethics states the following:

> Violations of the Code of Ethics or any of the Company's rules of conduct in effect will constitute grounds for disciplinary action, up to and including termination. Associates are expected to act fairly and honestly in all transactions with the Company and with others and to maintain the high ethical standards of the Company in accordance with this Code of Ethics.

> * * *

> Discovery of events of a questionable, fraudulent or illegal nature or which appear to be in violation of the Code of Ethics must be promptly reported. Failure to report such events also constitutes a violation of the Code of Ethics.

88.     The section of the Code of Ethics titled, "Honesty, Candor and Observance of Laws," further states the following:

> The Company strives to comply with all the laws and regulations that are applicable to its business. As a good citizen, the Company emphasizes good faith efforts to follow the spirit and intent of the law.

89.     In a section titled, "Candor Among Associates and in Dealing with Auditors and Counsel," the Code of Ethics states the following:

> Senior management of the Company must be informed at all times of matters that might adversely affect the reputation of the Company, regardless of the source of such information. Concealment may be considered a signal that the Company's policies and rules can be ignored, and such conduct cannot be tolerated. Moreover, complete candor is essential in dealing with the Company's independent auditors and attorneys.

90.     In a section titled, "Securities, Investment and Trading," the Code of Ethics states the following:

> Associates must never make changes in their personal investment portfolios on the basis of confidential information relating to the Company or obtained through the Company's business. In addition, associates are expected to follow the Company's Guidelines For Trading Common Stock and any other internal policies and procedures in effect from time to time.

91.    The "Securities, Investment and Trading" section of the Code of Ethics further states the following:

> Significant federal laws govern the disclosure of material, non-public information or trading in the Company's Common Stock on the basis of any such information. Those who disclose confidential information to an outsider who either trades on the information or passes the information along will be subject to the same sanctions as if they had traded the Company's Common Stock themselves.

92.    The Individual Defendants violated Workhorse's Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and failing to report the same. Moreover, six of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations and act with honesty and candor.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.    Workforce is an Ohio-based technology company that focuses on providing environmentally sustainable solutions to the commercial transportation sector. The Company is an American manufacturer which designs and builds all battery-electric delivery vehicles and drone systems. The Company's core business is last-mile delivery—the last leg of a journey comprising the movement of goods from a transportation hub to a final destination.

94.    The Company, which was initially based in Kansas, was incorporated in Nevada in November 2007 as a shell company under the moniker Title Starts Online, Inc. The Company went public on July 14, 2009 when its common stock began trading on the OTC Market. On December 28, 2009, the Company acquired 100% of the outstanding securities of Advanced Mechanical Products, Inc. (later known as AMP Electric

Vehicles, Inc.) and commenced operations as an electric vehicle manufacturer in Ohio before formally changing its name to AMP Holding Inc. on May 24, 2010. Thereafter, on April 16, 2015, the Company rebranded once again to its latest iteration, Workhorse, and began trading on the NASDAQ.

95. The Company has incurred net losses every year since its inception. Specifically, as of December 31, 2020, the Company has an accumulated deficit of approximately $109 million. Workhorse has had negative cash flow from operating activities amounting to $70.3 million, $36.9 million, and $21.8 million for the fiscal years ended December 31, 2020, 2019, and 2018, respectively.

96. According to an article published by *The Verge* on March 1, 2021, despite the fact that the Company has "bled money for years" it has been "able to survive thanks to loans from hedge funds and by selling off parts of its business."

97. In May 2019, then-President Donald J. Trump reported, via tweet, that Workhorse had agreed to purchase a former General Motors factory in Lordstown, Ohio which General Motors had closed in 2018.

98. According to an article published on September 3, 2019 by *Trucks.com*, Mike Ramsey, an analyst with Gartner Inc. commented on the importance of the USPS contract to Workhorse, stating that "[i]f they were to win even a piece of Postal Service business, that could absolutely make the difference between them raising the money and not."

99. Though, Workhorse's founder and former CEO, Steven Burns ("Burns"), had started a new company—Lordstown Motors ("Lordstown"), which was set to purchase the General Motors factory. Burns estimated that Lordstown would need approximately $450 million to purchase the facility and renovate so that it could start production. Lordstown was focused on building a simple electric work truck—a Workhorse project that had stalled out as the Company began to run out of money. To that point, Lordstown licensed the intellectual property it needed to manufacture those

trucks from Workhorse in consideration for, *inter alia*, the Company taking a 10% ownership stake in Lordstown, a 1% royalty fee paid to Workhorse on the gross sales price of the first 200,000 vehicles sold, and a 1% stake for Workhorse in any funding secured by Lordstown.

100.   Notably, in a telephone interview with *The Verge*, the contents of which were published in an article on March 11, 2020, Burns explained that he founded Lordstown since it would have been "impossible" for Workhorse to raise the capital necessary to fund the production of a commercial 7,500-pound light-duty pickup truck as a public company with limited financing options. According to that same article, the Company's business had come to a "standstill" as it awaited the USPS's decision.

101.   In fact, as of March 1, 2021, according to an article published by *The Verge*, Defendants Hughes and Schrader claimed that the Company had backlog of over 8,000 orders. However, the Company has failed to "execute" (which Defendant Schrader, in multiple interviews, has conceded Workhorse has yet to do) on the production side since, according to the article, Defendant Schrader stated that the Company was "trying to scale up to" manufacturing three trucks per day for the month of March 2021 while the Company's break-even point was approximately 200 vehicles per month—more than double that goal.

102.   On October 12, 2020, the Company issued a press release titled "Workhorse Secures $200 Million Financing from Institutional Lenders" which announced that the Company entered into a note purchase agreement under which it would sell $200 million aggregate principal amount of its 4% senior secured convertible notes due 2024 to two institutional lenders. Further, the press release explained that the agreement provided that those notes would be convertible into common stock by the holders at $36.14 per share, which was a premium of 35% more than the closing price of the Company's common stock on October 9, 2020, subject to certain potential closing adjustments.

103.   Despite this last-ditch attempt to raise capital, the Company badly needed to land the lucrative USPS Next Generation Delivery Vehicle contract to accomplish its goals and remain a viable player in the electric vehicle market.

### USPS Delivery Vehicle Fleet

104.   The USPS operates one of the world's largest civilian delivery vehicle fleets amounting to approximately 215,000. However, many of these vehicles, initially produced by Grumman Aerospace Corporation (later Northrop-Grumman) and General Motors, began service in 1986 and are now exceeding their expected service life of 24 years.

105.   As a result, according to the U.S. Government Accountability Office, the USPS is "increasingly incurring costs for unscheduled maintenance due to vehicle breakdowns, which can disrupt operations and increase costs." Also, the USPS had even been finding it difficult to fill vacancies for mechanics to perform the necessary repairs since new mechanics graduating from vocational schools are not trained to repair older vehicles.

106.   Additionally, according to an article published by *Vox* on April 22, 2020, most of these vehicles lack basic functions such as air conditioning, airbags, or anti-lock brakes and are too small to accommodate the increasing strain (in both size and number of packages) that the growing e-commerce market has exacted on delivery services. Further, it has been widely reported that some of the older postal vehicles have also recently been catching on fire.

### Next Generation Delivery Vehicle Program

107.   In January 2015, to address and replace the USPS's aging and costly delivery vehicle fleet, the USPS publicly began the Next Generation Delivery Vehicles acquisition process with a Request for Information and a kick-off meeting open to all interested technology and automotive suppliers to respond and participate with the intention of attracting the most innovative and cutting edge technological solutions.

108.   However, due to the USPS's financial woes (discussed below), the USPS did receive pushback from Congress on a total replacement strategy to address its well-documented issues with its delivery vehicle fleet. During a May 2015 hearing held by the House's Government Operations Subcommittee on issues related to the USPS's vehicle fleet, Representative Earl "Buddy" Carter (R-GA) stated that the USPS must "be responsible stewards of the dollar and ensure the repairs on their fleet are done in the most cost-efficient way." Also at the hearing, Representative Brenda Lawrence (D-MI), a 30-year veteran of the USP, questioned whether the USPS would run out of money if it selected a total replacement strategy.

109.   Nonetheless, after it initiated its Next Generation Delivery Vehicles program, the USPS determined that fifteen suppliers had prequalified to submit proposals to develop prototypes for the Next Generation Delivery Vehicles. Then, in October 2015, the USPS issued another Request for Information which included a statement of objectives in response to feedback it had received from the suppliers. The potential suppliers, including Workhorse which had initially teamed up with commercial-truck specialist St Engineering Hackney, Inc. (formerly, VT Hackney) until the two companies split on the project in December 2019, were given access to the USPS's processing and delivery environment and employees in preparation for their submission of proposals on the USPS's delivery vehicle design.

110.   After conducting an evaluation process, the USPS awarded six contracts to six suppliers, including Workhorse, to develop prototypes which the USPS then tested in a range of different climates, topography, population centers, and delivery environments to determine their respective abilities to meet the USPS's operational needs prior to selecting a supplier.

111.   The Company's annual report for the fiscal year ended December 31, 2019 filed with the SEC on March 13, 2020 on Form 10-K stated the following regarding the USPS's Next Generation Delivery Vehicle project:

<u>U.S. Post Office Replenishment Program / Next Generation Delivery Vehicle Project</u>

Workhorse was one of the five participants that the United States Postal Service ("USPS") selected to build prototype vehicles for the USPS Next Generation Delivery Vehicle ("NGDV") project. The USPS has publicly stated that approximately 165,000 vehicles are to be replaced. In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract. In 2019, the vehicles completed the required testing protocol as specified by the USPS. The USPS published a Request for Proposals in December 2019 for the Production Program.

112.   Notably, the Next Generation Delivery Vehicle contract was estimated to be valued at approximately $6.3 billion.

### USPS Financial Issues

113.   The USPS's longstanding financial troubles have been widely publicized for at least more than a decade. In fact, according to the USPS's quarterly report for the fiscal period ended December 31, 2020 filed on Form 10-Q with the Postal Regulatory Commission, since the Postal Accountability and Enhancement Act ("PAEA") was signed into law in December 2006, the USPS has incurred cumulative net losses of approximately $86.7 billion as it "continues to face systemic imbalances that make its current operating model unsustainable."

114.   There are various explanations as to the USPS's financial woes, a hot (and politicalized) topic leading up to this past U.S. election in November 2020 as the Postmaster General contemplated deep cost cutting measures which called into question the ability to timely deliver the dramatic rise in mail-in ballots sent in due to the coronavirus pandemic. In an article published on August 21, 2020, *Barron's* articulated four main explanations as to why the USPS has been consistently losing money: (1) as a quasi-governmental agency, it is not necessarily set up to make money; (2) the USPS is highly regulated by Congress and therefore lacks control over key aspects of its business such as pricing, which is often influenced by politics rather than market factors; (3) the

Verified Shareholder Derivative Complaint

PAEA required the USPS to prefund 75 years' worth of retiree health benefits in the span of just ten years—a cost of $110 billion; and (4) lackluster demand for mail delivery resulting from the rise of the Internet and, more recently, the coronavirus pandemic.

115.   In fact, although the USPS is meant to be a self-funded entity, in March 2020, Congress devoted as much as $10 billion in stimulus funds for the USPS to borrow to help stave off disaster and maintain the flow of mail and packages during the coronavirus pandemic. However, despite the large influx of cash, the USPS remained concerned that the funds would be insufficient to enable the USPS to withstand the significant downturn in its business resulting from the coronavirus pandemic.

### False and Misleading Statements

### *July 7, 2020 Benzinga Interview*

116.   On July 7, 2020, *Benzinga*, a financial media outlet, published an interview on its website that one of its staff writers had conducted with Defendant Schrader under the title "Workhorse's CFO On Meteoric Stock Rise, Electric Delivery Vehicle Maker's Capital Plans." During the interview, Defendant Schrader was asked "How does Workhorse separate itself from the competition?" Defendant Schrader responded that the Company's "trucks don't have a transmission, so we can save postal services upward of 60% of vehicle costs" and that the Company's "truck will cost fleets 40 cents a mile compared to the current $1 per mile."

### *July 21, 2020 Benzinga Interview and Tweet*

117.   On July 21, 2020, Defendant Schrader joined the hosts of *Benzinga's* live, interactive show, PreMarket Prep, for an additional interview, video of which was embedded in an article on *Benzinga's* website under the title "Workhorse CFO Talks USPS Contract, Says Company has 2-Year Lead on Competitors" and also posted to *Benzinga's* YouTube page under the title "PreMarket Prep: All about EV stocks with the Workhorse CFO $WKHS." On the same day, the Company posted a link to the YouTube video of the interview on Workhorse's Twitter account with the caption "Workhorse

CFO chats with Benzinga." According to the *Benzinga* article, during the interview, "Schrader also provided an update on the $6 billion U.S. Postal Service contract for its next-generation mail trucks. Workhorse is one of four remaining participants bidding for the contract. Schrader said he can't discuss too much about the process at this point, but Workhorse is the only all-electric option."

118.   Also during the interview, Defendant Schrader touted the Company's "all-electric" vehicle as "perfect" for the USPS, stating the following, in relevant part:

> ***"What I will say is our all-electric is probably the perfect vehicle for them.*** When you think about what the Post Office does, 70% of their trucks go about 17 to 18 miles a day and make 700 stops--mailbox, mailbox, mailbox. Ours runs more like a golf cart, so that's really what you need. Right now they get five to six miles per gallon. Ours get more than 40 miles per gallon equivalent," Schrader said.

(Emphasis added.)

119.   The *Benzinga* article further cited to Defendant Schrader's comments regarding the benefits that the Company's electric vehicles could provide to the USPS and flaunted the "great opportunity" that was the USPS contract. The article stated, "[i]n addition, he said Workhorse vehicles have half the maintenance costs of the current USPS fleet" and that "I think it's a great opportunity for us. Obviously, if we were to get the full award or a decent-sized award, that would be transforming for the company," Schrader said."

### August 6, 2020 CNBC Interview

120.   On August 6, 2020, Defendant Hughes joined *CNBC's* Melissa Lee on Fast Money to discuss the Company's business and the electric vehicle space. The Company posted a link to the video on Workforce's Twitter account the next day, August 7, 2020. During the interview Defendant Hughes and Lee had the following exchange:

Lee:         What can you tell us about the status of the U.S. Postal Service potential contract? That contract could be worth as much as about five to six billion dollars. You could get a partial award; you could get a full award. You submitted the RFP, I think,

mid-July. When will you know? Your CFO recently said that this award would be transformative for the company. I would imagine that would be so, if your cash position right now is about a hundred million; I mean, that contract could be truly changing for your company.

Hughes:     Yeah, I would say any contract like that would be changing for any company, virtually. In our case, we're unable to speak about the Post Office at all. I have to say no comment because we're under a gag order not to talk about it. But certainly, to your point, any contract that's worth billions of dollars coming into a company like ours would be a very company-changing experience.

### *August 10, 2020 Form 10-Q*

121.   On August 10, 2020, the Company filed with the SEC its quarterly report for the second fiscal quarter ended June 30, 2020 on Form 10-Q (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Hughes and Schrader, and contained SOX certifications signed by Defendants Hughes and Schrader attesting to the accuracy of the 2Q20 10-Q.

122.   The 2Q20 10-Q stated the following concerning the Company's internal controls:

There were no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the six months ended June 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *September 21, 2020 Proxy Statement*

123.   On September 21, 2020, the Company filed its Schedule 14A with the SEC (the "2020 Proxy Statement"). Defendants Hughes, Chess, Budde, Samuels, DeMott, and Clark solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

Verified Shareholder Derivative Complaint

124. With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it "applies to all of our directors, officers and employees including our Chief Executive Officer and Chief Financial Officer and principal accounting officer."

125. The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

126. The 2020 Proxy Statement also called for shareholders to approve, among other things: (1) the election of eight directors; (2) the issuance of the maximum number of shares of the Company's common stock issuable in connection with the potential future (i) conversion of the a senior secured convertible note for the principal amount of $70 million issued pursuant of the Securities Purchase Agreement dated June 30, 2020, and (ii) delivery of shares of the Company's common stock in lieu of cash payments of interest and principal on that note (the "Issuance Proposal"); and (3) the ratification of the Company's independent auditor for the fiscal year ending December 31, 2020.

127. The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

128. The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (2) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated

with doing so; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### October 29, 2020 Benzinga Interview and Tweet

129.   On October 29, 2020, Defendant Schrader once again joined Steve Israel ("Israel") of *Benzinga* for an interview, video of which was embedded in an article on *Benzinga's* website titled "Workhorse CFO Steve Schrader On The Status Of The USPS Contract, Delivery Guidance, And What Stands In Their Way" and was also posted to *Benzinga's* YouTube page under the title "USPS, Drones. & Production Outlook | Workhorse CFO Steve Schrader | Benzinga Exclusive." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "Workhorse CFO Steve Schrader." During the interview, Defendant Schrader and Israel had the following exchange regarding the USPS contract, in relevant part:

| | |
|---|---|
| Israel: | Can you just refresh us on what this deal would mean for Workhorse? |
| Hughes: | Well, the Post Office is bidding out 165,000 vehicles, so it's a huge fleet opportunity. And I think, from our standpoint, it would be transforming, right, from a standpoint of, just, now [we're] delivering a few vehicles and getting some revenues in and we have a backlog of about twelve hundred orders. But, you know, the Post Office would be 165,000 vehicles over a certain time period, too. So, it would be transforming. It would be a big opportunity for us. |
| Israel: | Do you expect, when they do award the contract, do you expect to be like the only recipient, the only winners, or do you expect to be one of several, or do you have any expectations there? |
| Schrader: | I don't think we have expectations one way or the other. It's, again, we can't comment on it. I think it's up to the Post Office and what they want to do and, at least publicly, they've said that they'll let everybody know by the end of the year. |

### November 9, 2020 Form 10-Q

130.   On November 9, 2020, the Company filed with the SEC its quarterly report for the third fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Hughes and Schrader, and contained SOX certifications signed by Defendants Hughes and Schrader attesting to the accuracy of the 3Q20 10-Q.

131.   The 3Q20 10-Q stated the following concerning the Company's internal controls:

> There were no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the nine months ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### January 26, 2021 Tweet

132.   On January 26, 2021, the Company stated "Thank you President Biden for your continued support for American-made Electric Vehicles. #workhorsegroup" on Workforce's Twitter account.

### January 27, 2021 Tweets and Simranpal Singh Interview

133.   On January 27, 2021, the Company stated "Our obsession is the perfect delivery and nothing is going to slow us down. #finalmile" on Workforce's Twitter account together with the following photograph:



134.   Also on January 27, 2021, Defendant Schrader joined Simranpal Singh, the host of a popular YouTube channel titled which focusses on investing in the stock market. The video of the interview was published on Singh's YouTube page under the title "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER! USPS CONTRACT UPDATE! | WKHS STOCK." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER." During the interview, Defendant Schrader stated the following regarding the USPS contract:

> ***It's positive what we're seeing from the administration, you know, President Biden just five days into his presidency has kind of pushed electric vehicles for all government agencies*. *That's a positive that, you know, not only that I think he pushed it for all-American, he pushed [electric vehicles] for the fleets he pushed all-American and he pushed small business, so I think that we were happy to hear all that*. I that that Secretary of Transportation nominee Pete Buttigieg has also talked about spending some money on infrastructure so I think the current administration is very positive about [electric vehicles] and it's a little different from a government standpoint as you usually have the government pushing things that is [sic] not ready for the commercial market, in this case commercial markets there you got interest from the customers on both sides and the investment side so money is going into [electric vehicles] as we can see as well so it's actually the government maybe is lagging behind a little even the states are ahead, California and New York with voucher programs, infrastructure support. It's actually the federal government that has them, *but now that the federal government is putting their full force behind it and always helps to get the federal government behind an industry, especially ours*.

(Emphasis added.)

### January 28, 2021 Jack Spencer Investing Interview and Tweet

135.   On January 28, 2021, Defendant Schrader joined Jack Spencer, the host of a popular YouTube channel named "Jack Spenser Investing" which concentrates on investing in the public equity markets. The video of the interview was published on Jack

Spencer Investing's YouTube page under the title "HUGE WORKHORSE STOCK UPDATES VIA STEVE SCHRADER - WKHS CFO." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "Steve Schrader talks with Jack Spencer." During the interview, Defendant Schrader and Spencer had the following exchange regarding the USPS contract:

Spencer:    So, Workhorse has been doing fantastic things as of late, over the last month or so in particular, and there's a few things I really want to speak about today. Now the first one is, Steve, I'd just like to hear your thoughts on Biden saying that the entire federal fleet will be replaced with electric vehicles, specifically American electric vehicles. And I know we can't speak about the USPS contract, even though that's what the entire comment section is probably asking us about, but I'd just like to get your thoughts on his statements and what it could potentially mean for Workhorse going forward.

Schrader:   *Yeah, I think the President's announcement was huge, for several reasons, right?* It's, one, supportive of the E.V. ("electric vehicle") market.

It's, two, all-American, like you said, all-American product buy. And I think he also said a lot about small businesses, and purchasing, whether it be parts or final products, from small businesses, too. *So, I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait and so I think that, putting a move on that was very quick too. I think it's also meaningful that, when you think about it, when the government gets behind things, things happen*.

And in this case, it's, the government actually is maybe somewhat behind the commercial market. As you well know, customers are already demanding these products, right? Investors are already looking at companies that are making these products, so I think everybody sees that E.V.s are kind of the way of the future going forward, and they see – customers see – the savings opportunities and I think what probably has, the only thing that has been missing, to some extent, is that now

Verified Shareholder Derivative Complaint

you've got the government behind it, from a standpoint of environmental, you know, and just – savings opportunities going forward. ***So, yeah, having the government push us and the President come out, like I said, five days after his inauguration, is huge***.

Spencer:     It was nice and quick. And as you just said, I think that's exactly what we wanted to see. I mean, we've spoken a few times now and you've made it very evident that a lot of the people who actually want to buy these trucks – I think every fleet manager in the country at this stage is now heavily contemplating E.V. more so than traditional[] vehicles, from a savings point of view. I think the government to an extent were a little bit behind, so they're seeing something like this come from the President himself, that has to be a huge catalyst to pretty much everybody involved, especially the all-American owned ones, which we know you guys stand very heavily for. So that's awesome; that's just awesome. And that, obviously, it's a very good thing.

Schrader:     ***Yes. It's a very good thing***. . ..

(Emphasis added.)

136.    The Company's secondary public offering closed on August 5, 2019. In connection with the offering, the Company issued 3,737,500 shares priced at $160.00 per share, and received approximately $38.5 million in proceeds.

137.    The statements in ¶¶ 116–122 and 129–136 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (2) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely

due to the exorbitant costs associated with doing so; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

138.   On February 23, 2021, the USPS issued a press release titled, "U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet" announcing that the USPS had awarded the Next Generation Delivery Vehicle contract to Oshkosh Defense, a company based in Oshkosh, Wisconsin and which revealed that Workhorse had not been selected by the USPS. The press release stated the following, in relevant part:

> WASHINGTON, DC — The U.S. Postal Service announced today it awarded a 10-year contract to Oshkosh, WI, based Oshkosh Defense, to manufacture a new generation of U.S.-built postal delivery vehicles that will drive the most dramatic modernization of the USPS fleet in three decades.

139.   On this news, the price of the Company's stock dropped from $31.34 per share at the close of trading on February 22, 2021, to $16.47 at the close of trading on February 23, 2020, a staggering drop of $14.87, or approximately 47.4%. Further, the price of the Company's stock continued to fall in after-hour trading, opening at $14.07 per share on February 24, 2021, an additional drop of $2.40, or approximately 14.6%. In total, from the market's close on February 22, 2021 to its opening on February 24, 2021, the Company's stock dropped $17.27, or approximately 55.1%.

140.   Thereafter, on February 24, 2021, *The New York Times* published an article titled "Losing Bid for Postal Contract Proves Costly for Electric-Vehicle Maker[:] Workhorse, a small truck maker with big ambitions, was counting on the deal for a surge in revenue. Its shares lost $2 billion in value." In the article, the Postmaster General Louis Dejoy, explained that Workhorse never really had a chance at winning the Next Generation Delivery Vehicle contract since the USPS simply did not have even close to

the requisite funds to electrify any significant portion of its fleet. The article stated the following, in relevant part:

> The choice of Oshkosh left open the possibility of some electrification. The new vehicles will be equipped with either fuel-efficient gasoline engines or electric batteries, and they will be retrofitted to keep pace with advances in electric-vehicle technology, the Postal Service said. But that rollout could be limited. In response to questioning at a House Oversight and Reform Committee hearing on Wednesday, the postmaster general, Louis DeJoy, said the agency's plan called for 10 percent of its new trucks to be electric. Asked by Representative Jackie Speier, a California Democrat, why that figure was not 90 percent, Mr. DeJoy pointed to cost. ***"We don't have the three or four extra billion dollars in our plan right now that it would take to do it," said Mr. DeJoy***[.]

(Emphasis added.)

## DAMAGES TO WORKHORSE

141.  As a direct and proximate result of the Individual Defendants' conduct, Workhorse has lost and expended, and will lose and expend, many millions of dollars.

142.  Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.  Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

144.  As a direct and proximate result of the Individual Defendants' conduct, Workhorse has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

145.   Plaintiff brings this action derivatively and for the benefit of Workhorse to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Workhorse, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

146.   Workhorse is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Workhorse. Plaintiff will adequately and fairly represent the interests of Workhorse in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

148.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

149.   A pre-suit demand on the Board of Workhorse is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

150.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while five of them engaged in insider sales based on material non-public information, netting proceeds of approximately $43.2 million, which renders them unable to impartially investigate the

charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

151.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

152.   Additional reasons that demand on Defendant Hughes is futile follow. Defendant Hughes has served as the Company's CEO and as a Company director since February 2019. Previously, he served as the Company's Chief Operating Officer and President from August 2016 until January 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Hughes with his principal occupation, and he receives handsome compensation, including $1,334,750 during fiscal year 2020. Defendant Hughes was ultimately responsible for all of the false and misleading statements and omissions that were made including, *inter alia*, those that he personally made during an interview with CNBC on August 6, 2020. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $14.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Hughes is a defendant in the Securities Class Actions. For these reasons, too, Defendant Hughes breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Chess is futile follow. Defendant Chess has served as a Company director since October 2013 and as Chairman of the Board since December 2015. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Chess has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $1.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Budde is futile follow. Defendant Budde has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee. Defendant Budde has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, the Company obtains its property and casualty insurance through AssuredPartners NL, LLC ("Assured"), an indirect subsidiary of AssuredPartners, Inc., where Defendant Budde is employed as Eastern Regions Chief Financial Officer. The Company paid Assured approximately $121,000 and $86,000 in brokerage fees for the years ended December 31, 2020 and

2019, respectively. For these reasons, too, Defendant Budde breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.   Additional reasons that demand on Defendant Samuels is futile follow. Defendant Samuels has served as a Company director since December 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Samuels has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $24.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Samuels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.   Additional reasons that demand on Defendant DeMott is futile follow. Defendant DeMott has served as a Company director since February 2015, and also serves as a member of the Compensation Committee. Defendant DeMott has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $2.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant DeMott breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Clark has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Clark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Mader is futile follow. Defendant Mader has served as a Company director since May 2020. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Mader has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sale before the fraud was exposed, which yielded $240,000 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Mader breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Dedo is futile follow. Defendant Dedo has served as a Company director since May 2020. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Dedo has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Dedo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand on the Board is futile follow.

161.    As described above, five of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Hughes, Chess, Samuels, DeMott, and Mader collectively received proceeds of approximately $43.2 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

162.    The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Chess and Mader worked at General Motors together from 1994 to 2010. Defendant Chess worked at General Motors from 1980 until 2017 in various roles including Chief Manufacturing Engineer and Executive Director of Stamping and Assembly as well as a Vehicle Line Executive. Defendant Mader worked at General Motors from 1994 through 2010 in various positions including as a Plant Manager of various General Motors assembly operations. Moreover, Defendants Chess, Budde,

Samuels, and DeMott have served on the Board together for at least approximately five years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

163.  Defendants Budde, Dedo, Samuels, and Clark (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

164.  In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

165.  Workhorse has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Workhorse any part of the damages Workhorse suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

166.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

167.   The acts complained of herein constitute violations of fiduciary duties owed by Workhorse's officers and directors, and these acts are incapable of ratification.

168.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Workhorse. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Workhorse, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

169.   If there is no directors' and officers' liability insurance, then the Directors will not cause Workhorse to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

170.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

171.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174.   Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose that: (1) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric

vehicle as its next generation delivery vehicle; (2) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

175.   The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

176.   Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and issue false and misleading statements and/or omissions of material fact.

177.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors and the approval of the Issuance Proposal.

178.   The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the approval of the Issuance Proposal and the election and/or re-election of Defendants Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo, which allowed them to continue breaching their fiduciary duties to Workhorse.

179.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

180.   Plaintiff on behalf of Workhorse has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

181.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Workhorse's business and affairs.

183.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Workhorse.

185.   In breach of their fiduciary duties owed to Workhorse, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (2) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

186.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading

statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

187.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

188.   In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $43.6 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

189.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

190.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and

engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

191.  These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

192.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Workhorse has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

193.  Plaintiff on behalf of Workhorse has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

194.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Workhorse.

196.  The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Workhorse that was tied to the performance or artificially inflated valuation of Workhorse, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

197.  Plaintiff, as a shareholder and representative of Workhorse, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any

performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

198.   Plaintiff on behalf of Workhorse has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

199.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

201.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

202.   Plaintiff on behalf of Workhorse has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Hughes and Schrader for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

203.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.   Workhorse, along with Defendants Hughes and Schrader are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hughes and Schrader's willful and/or reckless violations of their obligations as officers and/or directors of Workhorse.

205.   Defendants Hughes and Schrader, because of their positions of control and authority as officers and/or directors of Workhorse, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Workhorse, including the wrongful acts complained of herein and in the Securities Class Actions.

206.   Accordingly, Defendants Hughes and Schrader are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

207.   As such, Workhorse is entitled to receive all appropriate contribution or indemnification from Defendants Hughes and Schrader.

## **PRAYER FOR RELIEF**

208.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Workhorse, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Workhorse;

(c)   Determining and awarding to Workhorse the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Workhorse and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Workhorse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Workhorse to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Workhorse restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: May 19, 2021                   Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

_____/s Robert C. Moest_____.
Robert C. Moest, Of Counsel, SBN 62166

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Barry Caruso am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 5/18/2021 _____, 2021.

DocuSigned by:

_____
34A439B7D0EB42C...

Barry Caruso