Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WORKHORSE GROUP INC. DERIVATIVE LITIGATION | Lead Case No. 2:21-cv-04202 CJC(PVCx) |
| _____ | DEMAND FOR JURY TRIAL |
| This Document Relates to: | |
| ALL ACTIONS | |

## <u>VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiffs Barry Caruso, Mark Kistenmacher, and David Brown ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Workhorse Group Inc. ("Workhorse" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint against individual defendants Duane A. Hughes ("Hughes"), Steve Schrader ("Schrader"), Robert Willison ("Willison"), Gregory Ackerson ("Ackerson"), Stephen Fleming ("Fleming"), Anthony Furey ("Furey"), Raymond Chess ("Chess"), Gerald B. Budde ("Budde"), H. Benjamin Samuels ("Samuels"), Harry DeMott ("DeMott"), Michael L. Clark ("Clark"), Pamela S. Mader ("Mader"), and Jacqueline A. Dedo ("Dedo"), (collectively, the "Individual Defendants," and together with Workhorse, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Workhorse, unjust enrichment, gross mismanagement, waste of corporate assets, violation of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Workhorse, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing

committed by Workhorse's directors and officers from March 10, 2020 through May 10, 2021 (the "Relevant Period").

2.     Workhorse is an Ohio-based electric vehicle manufacturer. Specifically, the Company focuses on the production of battery-electric delivery vehicles and drone systems designed for last-mile delivery. Although the Company was founded in November 2007 and began operations in December 2009, since inception, the business has struggled to turn profitable as it has incurred net losses for all but one year, resulting in a sizeable, accumulated deficit of approximately $510 million.

3.     While struggling to get off the ground financially and operationally and in search of a "game-changer"[1] as Defendant Hughes characterized it, Workhorse threw its hat into the ring for a lucrative contract with the United States Postal Service ("USPS"), with an estimated value of up to $6.3 billion.

4.     USPS maintains one of the largest civilian delivery vehicle fleets in the world. However, the majority of its more than 200,000 delivery vehicles were built decades ago and lack basic functions such as air-conditioning or air bags and are near or have exceeded their planned service lives. As a result, for years, USPS has been experiencing vehicle breakdowns with increasing frequency and suffering from exorbitant maintenance costs and safety issues associated with its aging fleet.

5.     Despite facing serious budgetary pressures and widely reported financial issues, USPS announced its Next Generation Delivery Vehicles ("NGDV") program in January 2015, a multi-year process intended to replace its long life vehicles that had been in service for more than two decades.

6.     Throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and omissions of material

---

[1]     https://www.theverge.com/2021/3/1/22307333/workhorse-usps-mail-truck-contract-oshkosh (last visited April 6, 2022).

Verified Consolidated Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

fact regarding the likelihood of securing the USPS NGDV contract, the Company's manufacturing capacity, and the supposed orders in the Company's "backlog."

7.    In stark contrast to Defendants' representations, the Company was suffering from numerous operational problems that made the statements at issue materially false and misleading when made. For example, the Company's submissions to the NGDV bidding process consistently failed to meet the basic criteria necessary to be competitive, which failures the Company knew about as they occurred and which, in any event, USPS repeatedly alerted the Company about. Despite having this information, and while taking few meaningful steps to address the identified problems, the Individual Defendants continued to publicly represent that the Company was an actual contender to win the NGDV contract. Given the internally known state of affairs at the Company and its communications and experience with the USPS bidding process at the time these representations were made, Defendants could not have actually or reasonably believed that Workhorse had a viable opportunity to win the contract or were privy to undisclosed information that would severely impair the Company's ability to achieve the contract.

8.    For example, the Individual Defendants represented that Workhorse was ready to mass produce vehicles—including that the Company could produce 300–400 vehicles by the end of 2020 and 1,800 vehicles by the end of 2021—when its facilities lacked automation and the Company could only produce a very meager number of vehicles. According to Company insiders, Defendants' claims that Workhorse would be able to produce 300 to 400 trucks by the end of 2020 was "an absolute lie." Indeed, the Company did not even have the cash flow to expand its production capacity and its production rate up until that point was nowhere close to such a projection. When the truth emerged at the end of the Relevant Period, on May 10, 2021, Workhorse had produced only thirty-eight production vehicles. Yet, as late as October 29, 2020, even though Workhorse had fewer than eighteen trucks at the time, Defendant Schrader assured the investing public that Workhorse was on track to meet its bumptious target. In fact, in a

Verified Consolidated Shareholder Derivative Complaint

September 22, 2021 press release, the Company acknowledged that it had suspended vehicle production for the trucks it had touted throughout the Relevant Period and was recalling the mere forty-one vehicles it had managed to deliver up to that time. Moreover, Workhorse's prototypes could not and did not hold up during testing, to the point of causing significant injury to a USPS driver who was forced to jump out of a vehicle after a parking brake failure. USPS communicated numerous deficiencies to Workhorse with its proposal by September 2020, at least. Thus, the Individual Defendants' unbridled enthusiasm about Workhorse's chances to win the USPS contract were not based in reality and were made to artificially inflate the Company's stock.

9.      Finally, the Company's much touted backlog of orders, which purported customers were waiting for, was almost completely illusory. What the Individual Defendants were holding out as thousands of orders with real customers were simply nonbinding expressions of interest if they were even that. Despite publishing some of the conditions of customer orders in certain filings, following their publication, Defendants continued to refer to their growing backlog to imply that Workhorse was growing and able to meet increased demand. Defendants' misrepresentations were not merely statements of optimism grounded in the inherent unpredictability of business transactions. Rather, Defendants' representations concerning Workhorse's increased backlog persisted in the face of clear facts that cut against any future fulfillment. To illustrate, the "950" vehicles that UPS had the option to order was continually touted as probable even after UPS's announcement that it placed an order of 10,000 electric vehicles from a *different* company. Workhorse's purported backlog was material to analysts and investors valuing the Company's market price.

10.      As this fraud was being perpetrated, Defendants Hughes, Schrader, Willison, Ackerson, Fleming, Furey, Budde, Chess, DeMott, Samuels, and Mader engaged in lucrative insider sales while in possession of material nonpublic information, collectively

offloading 2,643,431 million shares of Company common stock at prices artificially inflated by their own misconduct, for aggregate proceeds of more than $61.4 million.

11.     The truth began emerging on October 8, 2020, when Fuzzy Panda Research ("Fuzzy Panda") published a report (the "Fuzzy Panda Report") disclosing the poor state of the Company's manufacturing facilities and its unpreparedness to begin mass producing vehicles.

12.     However, after a short-lived dip in the Company's stock price, the market began discounting the Fuzzy Panda Report due to Fuzzy Panda's short position in the Company's stock.

13.     The truth continued emerging on February 23, 2021, when USPS announced—in a press release, among other ways—that it had selected Oshkosh Defense, LLC ("Oshkosh") to fill the entire ten-year multi-billion-dollar NGDV contract.

14.     On this news, the price of the Company's stock dropped from $31.34 per share at the close of trading on February 22, 2021, to $16.47 per share at the close of trading on February 23, 2021, a staggering drop of $14.87, or approximately 47.4%.

15.     While market analysts were taken by surprise that the Company did not manage to secure *any part* of the massive NGDV deal, they remained somewhat optimistic given that the Company still supposedly had functioning manufacturing facilities and thousands of backlog orders for its vehicles.

16.     The truth fully emerged on May 10, 2021, when the Company announced its financial results for the first fiscal quarter ended March 31, 2021. In both a press release and on an earnings conference call, the Company revealed that it had only produced six vehicles in the first quarter and thirty-eight year-to-date, and that it would not be meeting the oft-repeated 1,800-vehicle figure. These minuscule figures demonstrated the real capacity of the Company's manufacturing and further demonstrated the impossibility of meeting the Company's overstated backlog.

17.     On this news, the Company's common stock fell from closing at $9.64 per

Verified Consolidated Shareholder Derivative Complaint

share on the previous trading day, May 7, 2021, to close on May 10, 2021 at $8.20 per share, a decline of $1.44 or about 15%. Because Workhorse never had a bonafide operational business, its stock price never consistently recovered and is now trading at $3.61 per share.

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Workhorse's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020 or 1,800 vehicles by the end of 2021; (3) the thousands of supposed orders in the Company's backlog were no indication of Workhorse's purported growth and ability, as they did not represent binding commitments to purchase vehicles and Defendants knew that fulfillment of these orders was improbable; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

19.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

20.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls that would reasonably assure that material representations made on behalf of the Company were reliable, accurate, and in compliance with the law.

21.     Furthermore, during the Relevant Period, while in possession of material

adverse non-public information, eleven of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $61.4 million.

22.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its former Chief Operating Officer ("COO"), and its Chief Accounting Officer ("CAO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (captioned *Farrar v. Workhorse Group, Inc. et al.*, Lead Case No. 2:21-cv-02072-CJC (PVCx) and referred to herein as the "Securities Class Action"),[2] and further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants, who were improperly overcompensated by the Company in light of their engagement in, or failure to mitigate, the alleged misconduct, and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the current and former director's and/or officers' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Workhorse's Board of Directors (the "Board") cannot consider a

---

[2] As discussed herein, on December 2, 2021, the Court denied in substantial part defendants' motion to dismiss the amended complaint in the Securities Class Action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

25.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

27.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

31.     Venue is proper in this District because Workhorse and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

Verified Consolidated Shareholder Derivative Complaint

# PARTIES

## Plaintiffs

32.    Plaintiff Barry Caruso is a current shareholder of Workhorse common stock who has continuously held Workhorse common stock at all relevant times.

33.    Plaintiff Barry Caruso is a citizen of Pennsylvania.

34.    Plaintiff Mark Kistenmacher is a current shareholder of Workhorse common stock who has continuously held Workhorse common stock at all relevant times.

35.    Plaintiff Mark Kistenmacher is a citizen of New Jersey.

36.    Plaintiff David Brown is a current shareholder of Workhorse common stock who has continuously held Workhorse common stock at all relevant times.

37.    Plaintiff David Brown is a citizen of California.

## Nominal Defendant Workhorse

38.    Workhorse is a Nevada corporation with its principal executive offices located at 100 Commerce Drive, Loveland, Ohio 45140. Workhorse's shares trade on The NASDAQ Capital Market ("NASDAQ") under the ticker symbol "WKHS."

## Defendant Hughes

39.    Defendant Hughes served as the Company's CEO and as a Company director from February 2019[3] until August 2, 2021. Defendant Hughes replaced Stephen S. Burns ("Burns"), who had served as the Company's CEO since 2009. Previously, Defendant Hughes served as the Company's COO and President from August 2016 until January 2019. According to the Company's annual report for the year ended December 31, 2020, filed with the SEC on Form 10-K on March 1, 2021 (the "2020 10-K"), as of February 15, 2021, Defendant Hughes beneficially owned 1,296,085 shares of the Company's common stock, which represented 1.0% of the Company's outstanding shares

---

[3] Although the 2020 10-K (as defined herein) states that Defendant Hughes has served in these roles since November 2019, the Company's current report filed with the SEC on Form 8-K on February 5, 2019 stated that Defendant Hughes' appointment as CEO and a member of the Board was effective February 4, 2019.

Verified Consolidated Shareholder Derivative Complaint

of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Hughes owned approximately $46.9 million worth of Workhorse stock at that time.[4]

40.     For the fiscal year ended December 31, 2021, Defendant Hughes received $1,390,373 in compensation from the Company. This included $335,373 in salary, $150,000 in bonus, $875,000 in non-equity incentive plan compensation, and $30,000 in monthly consulting payments of $15,000 for August and September 2021 pursuant to his independent contractor agreement with the Company following his departure. For the fiscal year ended December 31, 2020, Defendant Hughes received $1,334,750 in compensation from the Company. This included $475,000 in salary, $475,000 in stock awards, and $384,750 in non-equity incentive plan compensation. In connection with his separation from the Company, he received severance payments totaling $855,000.

41.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hughes made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 13, 2020 | 62,513 | $16.46 | $1,028,963.98 |
| September 17, 2020 | 50,000 | $25.78 | $1,289,000.00 |
| October 16, 2020 | 50,000 | $23.00 | $1,150,000.00 |
| December 15, 2020 | 55,989 | $21.61 | $1,209,922.29 |
| January 4, 2021 | 25,000 | $20.73 | $518,250.00 |
| January 7, 2021 | 100,000 | $25.00 | $2,500,000.00 |
| January 26, 2021 | 200,000 | $29.00 | $5,800,000.00 |
| February 1, 2021 | 25,000 | $35.97 | $899,250.00 |

Thus, in total, before the fraud was exposed, he sold 568,502 Company shares on inside information, which was nearly 33% of the 1,741,589 shares he beneficially owned as reported in Workhorse's Schedule 14A Notice of Annual Meeting and Proxy Statement dated August 10, 2020 (the "2020 Proxy Statement") for which he received $14.395

---

[4] The market was closed on Monday, February 15, 2021, for President's Day.

Verified Consolidated Shareholder Derivative Complaint

million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.     The 2020 10-K stated the following about Defendant Hughes:

Mr. Hughes is a senior-level executive with more than 20 years' experience including direct business relationships in the automotive, advertising, and technology segments. Mr. Hughes has served as our Chief Executive Officer and as a director since November 2019. Prior to Mr. Hughes' appointment as Chief Executive Officer, Mr. Hughes served as Chief Operating Officer and President of Workhorse from August 2016 through January 2019. Prior to joining Workhorse, Mr. Hughes served as Chief Operating Officer for Cumulus Interactive Technologies Group. As Chief Operating Officer, Mr. Hughes was responsible for managing the company's day-to-day sales and operations. He was responsible for all operations of the business unit. Prior to Cumulus Interactive Technologies Group, Mr. Hughes spent nearly fifteen years in senior management positions with Gannett Co., Inc., including his duties as Vice President of Sales and Operations for Gannett Media Technologies International. We believe that Mr. Hughes possesses specific attributes that qualify him to serve as a member of the Board, including the perspective and experience he brings as our Chief Executive Officer, including his historic knowledge, operational expertise, and continuity to the Board.

43.     Upon information and belief, Defendant Hughes is a citizen of Ohio.

**Defendant Schrader**

44.     Defendant Schrader served as the Company's CFO from December 2019 until September 29, 2021, when the Company informed him that his contract would not be renewed. According to the 2020 10-K, as of February 15, 2021, Defendant Schrader beneficially owned 160,361 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Schrader owned approximately $5.8 million worth of Workhorse stock at that time.

45.     For the fiscal year ended December 31, 2021, Defendant Schrader received $971,237 in compensation from the Company. This included $267,969 in salary,

$475,000 in stock awards, and $228,267 in non-equity incentive plan compensation. In connection with his separation from the Company, he entered into an employment separation agreement and release of claims with the Company pursuant to which he received payments totaling $200,000.

46.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schrader made the following sale of Company stock, which was 8.4% of the 179,950 shares he beneficially owned as reported in the 2020 Proxy Statement and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| December 14, 2020 | 15,152 | $21.92 | $332,131.84 |

His insider sale made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.    The 2020 10-K stated the following about Defendant Schrader:

Mr. Schrader has over sixteen years of experience in public and private companies in industries such as manufacturing, health care and utilities and is currently serving as our Chief Financial Officer. Prior to his appointment by the Company, from December 2015 to December 2019, Mr. Schrader was Chief Financial Officer of Fuyao Glass America Inc., a subsidiary of a Chinese-owned public company specializing in the manufacture of automobile glass. From October 2006 to May 2015, Mr. Schrader served as the Chief Financial Officer of Oncology Hematology Care ("OHC"), the largest oncology practice in the Cincinnati metro area. Mr. Schrader started his career working for utilities that are now part of Duke Energy. His last position there was Vice President and Chief Financial Officer of Cinergy's Regulated Business prior to Duke's acquisition in 2006. Mr. Schrader holds a B.S. in Finance and Accounting from Ball State and an MBA from Butler University. He also received an Advanced Management Program Certificate from Harvard Business School.

48.    Upon information and belief, Defendant Schrader is a citizen of Ohio.

**Defendant Willison**

49. Defendant Willison served as the Company's COO from February 19, 2019 until September 30, 2021, the day after he was informed that his employment contract was not being renewed. According to the 2020 10-K, as of February 15, 2021, Defendant Willison beneficially owned 228,405 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Willison owned approximately $8.3 million worth of Workhorse stock at that time.

50. For the fiscal year ended December 31, 2020, Defendant Willison received $626,250 in compensation from the Company. This included $300,000 in salary, $225,000 in stock awards, and $101,250 in non-equity incentive plan compensation. Moreover, pursuant to a separation agreement he entered into with the Company in connection with his departure, he received a payment of $75,000.

51. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Willison made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 15, 2020 | 19,920 | $16.34 | $325,492 |
| January 26, 2021 | 150,000 | $30.00 | $4,500,000 |

Thus, in total, before the fraud was exposed, he sold 169,920 Company shares on inside information, which was 55% of the 309,508 shares he beneficially owned as reported in the 2020 Proxy Statement, for which he received $4.82 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

52. The 2020 10-K stated the following about Defendant Willison:

On February 19, 2019, the Company announced the appointment of Robert Willison as Chief Operating Officer effective February 18, 2019. Mr. Willison previously served as Director of Fleet Technology for Sysco

13

Corporation. Prior to joining Sysco, Mr. Willison served as the Company's Director of Research and Development from 2016 until 2018. Prior to joining the Company, Mr. Willison served as a Partner and Chief Technology Officer for Räv Technology LLC from 2014 until 2016. Prior to joining Räv Technology, Mr. Willison served as Director of International Operations and New Business Development for PDi Communication Systems.

53.     Upon information and belief, Defendant Willison is a citizen of Ohio.

**Defendant Ackerson**

54.     Defendant Ackerson has served as the Company's Corporate Controller and Chief Accounting Officer since April 2018. According to the Company's definitive proxy statement filed on Schedule 14A on March 24, 2022 with the SEC (the "2022 Proxy Statement"), as of March 7, 2022, Defendant Ackerson beneficially owned 215,941 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Ackerson owned approximately $783,866 worth of Workhorse stock.

55.     For the fiscal year ended December 31, 2021, Defendant Ackerson received $694,385 in compensation from the Company. This included $216,923 in salary, $100,000 in bonus, $345,325 in stock options, and $32,137 in non-equity incentive plan compensation.

56.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ackerson made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| September 14, 2020 | 10,869 | $23.85 | $259,225 |
| January 18, 2021 | 3,223 | $27.91 | $89,953 |
| January 27, 2021 | 6,445 | $37.50 | $241,687 |

Thus, in total, before the fraud was exposed, he sold 20,537 Company shares on inside information, which was 18% of the 114,037 shares he beneficially owned as reported in his Form 4 filed September 16, 2020, for which he received $590,865. His insider sales

made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

57.     The 2022 Proxy Statement stated the following about Defendant Ackerson:

Mr. Ackerson has been with the Company since April 2018. In addition to serving as Corporate Controller, he served as the Company's Interim Chief Financial Officer from September 2021 through January 2022. Prior to joining the Company, Mr. Ackerson was an Assurance Senior Manager with BDO USA LLP from December 2015 through March 2018 and Senior Manager Technical Accounting for NewPage Corporation from April 2011 through March 2015. Mr. Ackerson has also served as an Inspection Specialist for PCAOB and various progressive audit roles with PwC. Mr. Ackerson received his Master of Science in Accounting and Bachelor of Business Administration and Finance from the University of Cincinnati in 2000.

58.     Upon information and belief, Defendant Ackerson is a citizen of Ohio.

**Defendant Fleming**

59.     Defendant Fleming served as the Company's Vice President and General Counsel from November 2019 until November 2021, when his employment contract was not renewed. According to the 2020 10-K, as of February 15, 2021, Defendant Fleming beneficially owned 364,221 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $36.19, Defendant Fleming owned approximately $13.2 million of Workhorse stock at that time.

60.     For the fiscal year ended December 31, 2020, Defendant Fleming received $626,250 in compensation from the Company. This included $300,000 in salary, $225,000 in stock awards, and $101,250 in non-equity incentive plan compensation.

61.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Fleming made the following sales of company stock, and made no purchases of Company stock:

Verified Consolidated Shareholder Derivative Complaint

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 13, 2020 | 40,000 | $16.46 | $658,520 |
| September 14, 2020 | 50,000 | $23.85 | $1,192,500 |
| October 16, 2020 | 50,000 | $23.00 | $1,150,000 |
| December 14, 2020 | 164,796 | $21.92 | $3,612,328 |

Thus, in total, before the fraud was exposed, he sold 304,796 Company shares on inside information, which was 46.5% of the 655,171 shares he beneficially owned as reported in the 2020 Proxy Statement for which he received $6.613 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

62.    The 2020 10-K stated the following about Defendant Fleming:

Mr. Fleming serves as our corporate general counsel. Prior to joining Workhorse in November 2019, Mr. Fleming served as outside corporate/securities counsel to Workhorse since 2010. Mr. Fleming has served as the Managing Member of Fleming PLLC, a boutique law firm specializing in corporate/securities law, since 2008. Mr. Fleming graduated from Catholic University of America in 1995 with a Bachelor of Arts in Political Science. In 1999, Mr. Fleming received his Juris Doctorate and Master of Science in Finance from the University of Denver.

63.    Upon information and belief, Defendant Fleming is a citizen of New York.

**Defendant Furey**

64.    Defendant Furey has served as the Company's Vice President of Finance since November 2019. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Furey beneficially owned 279,179 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Furey owned approximately $1.0 million of Workhorse stock.

65.    Pursuant to an employment agreement dated November 6, 2019, Defendant Furey was entitled to at least $225,000 in annual base salary. Moreover, Defendant Furey was entitled to a cash bonus as determined by the Compensation Committee based upon

the level of achievement of certain performance goals. Specifically, his target bonus would be 50% of his base salary with the potential to receive up to 75% of his base salary. Further, Defendant Furey was eligible to receive equity incentive grants subject to certain conditions.

66.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Furey made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 17, 2020 | 30,000 | $16.34 | $490,200 |
| September 14, 2020 | 50,000 | $23.85 | $1,192,500 |
| October 16, 2020 | 50,000 | $23.00 | $1,150,000 |
| December 14, 2020 | 71,862 | $21.92 | $1,575,215 |

Thus, in total, before the fraud was exposed, he sold 201,862 Company shares on inside information, which was 52.2% of the 386,523 shares he beneficially owned as reported in the 2020 Proxy Statement, for which he received $4.404 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

67.     The 2022 Proxy Statement stated the following about Defendant Furey:

Mr. Furey is a senior-level finance executive with more than 25 years of experience in corporate finance and capital markets and is currently serving as our Vice President of Finance. Prior to that, Mr. Furey was the Director of Business Development for Workhorse and Director of Finance for SureFly a former subsidiary of Workhorse. Prior to joining Workhorse, Mr. Furey owned and was president of Fastnet Advisors, LLC, a mergers and acquisitions and corporate advisory practice. As President, Mr. Furey led over $300 million in financing and uplisting transactions and was responsible for managing the company's day-to-day growth and operations. Prior to Fastnet Advisors, LLC, Mr. Furey spent fifteen years on both the buy and sell side in institutional sales and trading, holding Series 7, 65 & 63 licenses.

68.     Upon information and belief, Defendant Furey is a citizen of New York.

**Defendant Chess**

69.     Defendant Chess has served as a Company director since October 2013 and as Chairman of the Board since December 2015. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Chess beneficially owned 158,262 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Chess owned approximately $574,491 worth of Workhorse stock.

70.     For the fiscal year ended December 31, 2021, Defendant Chess received $167,916 in compensation from the Company. This included $82,916 in fees earned or paid in cash and $85,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Chess received $135,000 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $70,000 in stock awards.

71.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| July 15, 2020 | 27,365 | $16.34 | $447,144.10 |
| August 17, 2020 | 4,000 | $15.32 | $61,280.00 |
| September 15, 2020 | 4,000 | $25.41 | $101,640.00 |
| October 15, 2020 | 4,000 | $22.39 | $89,560.00 |
| November 16, 2020 | 4,000 | $19.26 | $77,040.00 |
| December 18, 2020 | 5,000 | $21.05 | $105,250.00 |
| January 7, 2021 | 10,000 | $24.77 | $247,700.00 |
| January 15, 2021 | 4,853 | $24.46 | $118,704.38 |
| February 16, 2021 | 5,000 | $35.98 | $179,900.00 |
| March 15, 2021 | 5,000 | $16.67 | $83,350 |
| April 15, 2021 | 5,000 | $12.59 | $62,950 |

Thus, in total, before the fraud was exposed, he sold 78,218 Company shares on inside information, which was 44.1% of the 177,243 shares he beneficially owned as reported in the 2020 Proxy Statement for which he received $1.62 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

72.    The 2022 Proxy Statement stated the following about Defendant Chess:

Mr. Chess has more than 40 years of experience in the automotive industry. Mr. Chess joined General Motors in 1980, and during his 37 years with General Motors, he held ever increasing roles and responsibilities in both manufacturing and product development. While in manufacturing, Mr. Chess held key positions in both plant floor operations and manufacturing engineering such as Chief Manufacturing Engineer and Executive Director of Stamping and Assembly. While in product development, Mr. Chess was a Vehicle Line Executive, where he led global cross functional responsibilities for GM's commercial truck line from 2001 to 2009 and GM's cross over segment from 2009 through 2012. Upon retirement from General Motors, he formed his own engineering consulting company. Mr. Chess serves on the Board of Directors of Rush Enterprises, Inc. (NASDAQ: RUSHA). Mr. Chess holds a Bachelor of Science in Mechanical Engineering from Kettering University and a Masters of Business Administration from Indiana University. He started working with Workhorse in 2014 on our advisory board, was then elected to our Board of Directors and subsequently became our Chairman. Mr. Chess' extensive industry knowledge and executive experience in the automobile industry, together with his experience on other public company boards, position him well to serve as our Chairman and a member of our committees.

73.    Upon information and belief, Defendant Chess is a citizen of Michigan.

**Defendant Budde**

74.    Defendant Budde has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Budde beneficially owned 251,016 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on March 7, 2022 was $3.63, Defendant Budde owned approximately $911,188 worth of Workhorse stock.

75.    For the fiscal year ended December 31, 2021, Defendant Budde received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Budde received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

76.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Budde made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| August 31, 2020 | 50,000 | $17.72 | $886,000 |
| January 26, 2021 | 10,000 | $30.98 | $309,800 |

Thus, in total, before the fraud was exposed, he sold 60,000 Company shares on inside information, which was 22% of the 274,047 shares he beneficially owned as reported in the 2020 Proxy Statement, for which he received  $1.195 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

77.    The 2022 Proxy Statement stated the following about Defendant Budde:

Mr. Budde is currently Vice President, Corporate Finance for AssuredPartners, Inc. Mr. Budde started his career in public accounting with EY after graduating with a Bachelor of Science degree in Accounting from the University of Dayton. After almost eleven years with EY as a licensed CPA, Mr. Budde joined Cincinnati Milacron Inc. in April 1994. Mr. Budde was appointed as Machine Tool Group Controller in January 1995, became the Vice President of Finance for Cincinnati Machine, a successor company, in October 1998, and was subsequently appointed as Vice President of Finance and Administration for UNOVA Manufacturing Technologies in 2002. Mr. Budde left UNOVA in 2003 to become the Chief Financial

Officer at Neace Lukens, which was acquired by AssuredPartners in 2011. Prior to his current role, Mr. Budde was the Eastern Region Chief Financial Officer from 2018 to 2021 and the Midwest Region Chief Financial Officer overseeing multiple AssuredPartners entities. Mr. Budde is currently a member of the Finance Committee for St Margaret of York parish and previously served on the Board of Trustees and Finance Committee for Mount Notre Dame High School. Mr. Budde's business, management, and accounting knowledge and executive leadership experience qualify him well to serve as a member of our Board and as Chair of our Audit Committee. The Board has determined that Mr. Budde is an "audit committee financial expert" as defined in Item 407(d)(5) of Regulation S-K and demonstrates "financial sophistication" as defined by the rules of the Nasdaq.

78.    Upon information and belief, Defendant Budde is a citizen of Ohio.

**Defendant Samuels**

79.    Defendant Samuels has served as a Company director since December 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Samuels beneficially owned 1,097,059 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Samuels owned approximately $4.0 million worth of Workhorse stock.

80.    For the fiscal year ended December 31, 2021, Defendant Samuels received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Samuels received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

81.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Samuels made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| August 18, 2020 | 500,000 | $16.65 | $8,325,000.00 |

| November 20, 2020 | 99,999 | $25.01 | $2,500,974.99 |
| January 4, 2021 | 99,999 | $20.73 | $2,072,979.27 |
| January 7, 2021 | 99,999 | $26.00 | $2,599,974.00 |
| January 26, 2021 | 299,997 | $30.00 | $8,999,910.00 |

Thus, in total, before the fraud was exposed, he sold 1,099,994 Company shares on inside information, which was 51% of the 2,160,083 shares he beneficially owned as reported in the 2020 Proxy Statement, for which he received $24.498 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

82.     The 2022 Proxy Statement stated the following about Defendant Samuels:

Mr. Samuels has more than 25 years of experience as a senior business executive. He served as CEO of Victory Packaging from 2007 through 2015, during which time he led an executive team managing more than 1,700 employees. From 2015 to 2019, Mr. Samuels was appointed as Co-President after Victory Packaging was acquired by KapStone Paper and Packaging Corporation. From 1995 through 2007, Mr. Samuels served in multiple roles, including as Vice Chairman and leader of Victory Packaging's national accounts group, real estate, and finance and legal departments, achieving a period of unprecedented growth in sales and profitability. He is currently the Board Chair of Saxco, a packaging distributor focused on the food and beverage industry, and of Leedo Manufacturing, a producer of kitchen and bath cabinets. Mr. Samuels is an active member in the community, where he serves as Board Chair of the Jewish Federation of Greater Houston and as a Director of the Samuels Family Foundation. Mr. Samuels also serves on the boards of, and holds leadership positions with, Teach For America, Children at Risk, Brighter Bites, Move For Hunger, Leo Baeck Education Center Foundation, and Houston Food Bank. Mr. Samuels received a Bachelor of Arts in American Studies and Economics from Amherst College as well as a Master of Business Administration from the Harvard Graduate School of Business Administration. Mr. Samuels business, management and financial knowledge and experience, including his deep understanding of managing and operating significant organizations as an executive, qualify him well to serve as a member of our Board and our committees.

83.     Upon information and belief, Defendant Samuels is a citizen of Texas.

22

**Defendant DeMott**

84.    Defendant DeMott has served as a Company director since September 2016. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant DeMott beneficially owned 60,874 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant DeMott owned approximately $220,972 worth of Workhorse stock.

85.    For the fiscal year ended December 31, 2021, Defendant DeMott received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant DeMott received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

86.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant DeMott made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| September 28, 2020 | 50,000 | $26.14 | $1,307,000.00 |
| December 14, 2020 | 62,450 | $21.92 | $1,368,904.00 |
| March 15, 2021 | 4,000 | $16.67 | $66,680 |

Thus, in total, before the fraud was exposed, he sold 116,450 Company shares on inside information, which was 85.4% of the 136,355 shares he beneficially owned as reported in the 2020 Proxy Statement. for which he received $2.742 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

87.    The 2022 Proxy Statement stated the following about Defendant DeMott:

Mr. DeMott has more than 30 years of experience in the investment community, having worked as a research analyst and portfolio manager at investment banks, hedge funds and venture capital funds. He has served on the boards of several public companies, and chaired a variety of board committees. He is a long-time operator and investor in the media, sports and entertainment industries. He is the co-founder of Raptor Ventures I LP, where he has been a General Partner since February 2011. In addition, Mr. DeMott is a member of the Board of Directors of Temerity Media d/b/a Proper (where he was the co-founder and also serves as CEO), Achari VenturesHolding Corp (AVHIU - where he chairs the audit committee), SecurityPoint Media, Kinslips and Ticket Evolution. He also serves as founder and managing partner for Harmerle Investments, a family investment company. Prior to co-founding Raptor Ventures, Mr. DeMott served on the Board of Directors of Pandora Media, Inc. from 2006 through 2011. Earlier, he served as senior analyst at Knighthead Capital Management, an analyst at King Street Capital Management, portfolio manager at Bourgeon Capital Management and managing member and founder at Gothic Capital Management. Mr. DeMott focused on finding, fostering and investing in disruptive technology companies. He previously spent nine years at First Boston (now Credit Suisse), where he was a director in the equity research division specializing in radio, TV, outdoor advertising and cell towers. He earned a Bachelor of Arts degree in economics from Princeton University in 1988 and a Master of Business Administration in finance from New York University in 1991. We believe that Mr. DeMott's business management and financial experience and knowledge, including his deep understanding of the financial markets and his experience in starting and operating various companies, qualify him well to serve as a member of our Board and our committees.

88.     Upon information and belief, Defendant DeMott is a citizen of New York.

**Defendant Clark**

89.     Defendant Clark has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Clark beneficially owned 165,324 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7,

2022 was $3.63, Defendant Clark owned approximately $600,126 worth of Workhorse stock.

90.    For the fiscal year ended December 31, 2021, Defendant Clark received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Clark received $114,167 in compensation from the Company. This included $54,167 in fees earned or paid in cash and $60,000 in stock awards.

91.    The 2022 Proxy Statement stated the following about Defendant Clark:

Mr. Clark is a Chartered Financial Analyst (CFA) Charterholder with close to twenty years of investing and capital markets experience. He serves as a director of Laws Whiskey House, a privately held, Denver-based award-winning craft distillery. Mr. Clark has also served as a director of Halcón Resources from since September 2016 until October 2019 and as a director of Paragon Offshore Ltd., including as Chairman of the Corporate Governance and Compensation Committee and a member of its Audit Committee, from July 2017 until its sale to Borr Drilling Limited in March 2018. Mr. Clark was a Partner of SIR Capital Management, LLC from 2014 until his retirement in 2016 and from 2008 to 2013 he served as a Portfolio Manager and Partner. Prior to that, Mr. Clark valued equities as a Portfolio Manager at Satellite Asset Management, LLC from 2005 to 2007 and as an Equity Research Analyst at SAC Capital Management, LLC from 2003 to 2005 and at Merrill Lynch from 1997 to 2002. Mr. Clark began his career at Deloitte & Touche, LLP, progressing to Senior Auditor. He is a Certified Public Accountant licensed in New York State. The National Association of Corporate Directors (NACD) recognized him as an NACD Governance Fellow in 2017. Mr. Clark earned a Bachelor of Arts in Economics from the University of Pennsylvania and a Master of Business Administration in Finance and Economics with Distinction from New York University's Stern School of Business. We believe that Mr. Clark's public company board service and his wealth of accounting, valuation and capital markets experience position him well to serve as a member of our Board and our committees.

92.    Upon information and belief, Defendant Clark is a citizen of New York.

**Defendant Mader**

93.     Defendant Mader has served as a Company director since May 2020. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Mader beneficially owned 40,908 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Mader owned approximately $148,496 worth of Workhorse stock.

94.     For the fiscal year ended December 31, 2021, Defendant Mader received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Mader received $68,333 in compensation from the Company. This included $33,333 in fees earned or paid in cash and $35,000 in stock awards.

95.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mader made the following sale of company stock, which was 67% of the 11,939 shares she beneficially owned as reported in the 2020 Proxy Statement, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| November 24, 2020 | 8,000 | $30.00 | $240,000.00 |

Her insider sale made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

96.     The 2022 Proxy Statement stated the following about Defendant Mader:

Ms. Mader brings over three decades of automotive, manufacturing, and consultancy experience, with an accomplished track record in leading Fortune 100 manufacturing organizations and driving growth in entrepreneurial companies. Prior to 2020, Ms. Mader served as VP of Consulting at Belcan Consulting, Engineering, and Technical Services, LLC.

From 2012 through 2018, Ms. Mader held various executive positions leading manufacturing advisory services with Allegiant International, LLC. As VP of Internal Operations, she led purchasing and supplier management, sales and marketing, HR and talent acquisition, and customer relations. Ms. Mader drove significant growth in supply chain advisory services in the US market, while also expanding the business into Mexico and Europe. From 1986 through 2010, Ms. Mader held positions of increasing responsibility within General Motors including Plant Manager of several General Motor's assembly, stamping, and powertrain operations. Ms. Mader led plants with more than 4,500 employees, producing award winning, segment leading vehicles. She was recognized in Automotive News' 100 Leading Women and is a Distinguished Alumnus of Purdue University. Ms. Mader received a Bachelor of Science in Organizational Leadership from Purdue University and serves as a Board Member for Purdue University, College of Polytechnic. We believe that Ms. Mader's extensive automotive industry and manufacturing experience, together with her experience with emerging growth companies, position her well to serve as a member of our Board and our committees.

97.   Upon information and belief, Defendant Mader is a citizen of Indiana.

**Defendant Dedo**

98.   Defendant Dedo has served as a Company director since May 2020. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of March 7, 2022, Defendant Dedo beneficially owned 48,908 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 7, 2022 was $3.63, Defendant Dedo owned approximately $177,536 worth of Workhorse stock.

99.   For the fiscal year ended December 31, 2021, Defendant Dedo received $119,167 in compensation from the Company. This included $59,167 in fees earned or paid in cash and $60,000 in stock awards. For the fiscal year ended December 31, 2020, Defendant Dedo received $68,333 in compensation from the Company. This included $33,333 in fees earned or paid in cash and $35,000 in stock awards.

100.   The 2022 Proxy Statement stated the following about Defendant Dedo:

Verified Consolidated Shareholder Derivative Complaint

Ms. Dedo has over 30 years of global automotive, off highway, industrial and aftermarket experience. She has held various leadership positions at Piston Group, Dana Holding Corp., The Timken Co., Motorola and Robert Bosch Corporation, among others, and has a proven background in managing full P&L responsibilities for major business units and entire companies responsible for up to $2 billion in revenue. In 2015, Ms. Dedo co-founded Aware Mobility LLC, which is focused on the development, investing, partnering and application of both electrified propulsion and connectivity tools, platforms and applications. Prior to May 2015, Ms. Dedo served as President of Piston Group and held various positions with Dana Holding Corp, The Timken Company, Motorola, Covisint LLC, Robert Bosch Corporation and Cadillac Motor Car Company. Ms. Dedo received a Bachelor of Science degree in Electrical Engineering from Kettering University and holds a number of board positions including Cadillac Products Automotive, Kettering University and Michigan Science Center. We believe that Ms. Dedo's extensive and varied executive experience at several significant companies, together with her proven leadership skills, qualify her well to serve as a member of our Board and our committees.

101.    Upon information and belief, Defendant Dedo is a citizen of Michigan.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

102.    By reason of their positions as officers, directors, and/or fiduciaries of Workhorse and because of their ability to control the business and corporate affairs of Workhorse, the Individual Defendants owed Workhorse and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Workhorse in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Workhorse and its shareholders so as to benefit all shareholders equally.

103.    Each director and officer of the Company owes to Workhorse and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

Verified Consolidated Shareholder Derivative Complaint

104. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Workhorse, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

105. To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

106. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Workhorse, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Workhorse's Board at all relevant times.

107. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed

to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

108.   To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Workhorse were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Ohio, and the United States, and pursuant to Workhorse's own Code of Ethics (the "Code of Ethics");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Workhorse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Workhorse and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Workhorse's operations would comply with all applicable laws and Workhorse's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

109.   Each of the Individual Defendants further owed to Workhorse and the shareholders the duty of loyalty requiring that each favor Workhorse's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

110.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Workhorse and were at all times acting within the course and scope of such agency.

111.   Because of their advisory, executive, managerial, and directorial positions with Workhorse, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

112.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Workhorse.

**<u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>**

113.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

114.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

115.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Workhorse was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

116.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

117.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Workhorse and was at all times acting

within the course and scope of such agency.

## WORKHORSE'S CODE OF ETHICS AND CORPORATE GOVERNANCE

118.   The 2020 Proxy Statement (defined above) states that the Code of Ethics "applies to all of our directors, officers and employees including our Chief Executive Officer and Chief Financial Officer and principal accounting officer."

119.   As a "General Statement of Policy," the Company's Code of Ethics states the following:

• Honesty and candor in our activities, including observance of the spirit, as well as the letter of the law;
• Avoidance of conflicts between personal interests and the interests of the Company, or even the appearance of such conflicts;

* * *

• Compliance with generally accepted accounting principles and controls;
• Maintenance of our reputation and avoidance of activities which might reflect adversely on the Company; and
• Integrity in dealing with the Company's assets.

120.   In a section titled, "Honesty, Candor and Observance of Laws," the Code of Ethics states the following:

Violations of the Code of Ethics or any of the Company's rules of conduct in effect will constitute grounds for disciplinary action, up to and including termination. Associates are expected to act fairly and honestly in all transactions with the Company and with others and to maintain the high ethical standards of the Company in accordance with this Code of Ethics.

* * *

Discovery of events of a questionable, fraudulent or illegal nature or which appear to be in violation of the Code of Ethics must be promptly reported. Failure to report such events also constitutes a violation of the Code of Ethics.

121.   The section of the Code of Ethics titled, "Honesty, Candor and Observance of Laws," further states the following:

Verified Consolidated Shareholder Derivative Complaint

The Company strives to comply with all the laws and regulations that are applicable to its business. As a good citizen, the Company emphasizes good faith efforts to follow the spirit and intent of the law.

122.   In a section titled, "Candor Among Associates and in Dealing with Auditors and Counsel," the Code of Ethics states the following:

Senior management of the Company must be informed at all times of matters that might adversely affect the reputation of the Company, regardless of the source of such information. Concealment may be considered a signal that the Company's policies and rules can be ignored, and such conduct cannot be tolerated. Moreover, complete candor is essential in dealing with the Company's independent auditors and attorneys.

123.   In a section titled, "Securities, Investment and Trading," the Code of Ethics states the following:

Associates must never make changes in their personal investment portfolios on the basis of confidential information relating to the Company or obtained through the Company's business. In addition, associates are expected to follow the Company's Guidelines For Trading Common Stock and any other internal policies and procedures in effect from time to time.

124.   The "Securities, Investment and Trading" section of the Code of Ethics further states the following:

Significant federal laws govern the disclosure of material, nonpublic information or trading in the Company's Common Stock on the basis of any such information. Those who disclose confidential information to an outsider who either trades on the information or passes the information along will be subject to the same sanctions as if they had traded the Company's Common Stock themselves.

125.   The Individual Defendants violated Workhorse's Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, and failing to report the same. Moreover, eleven of the Individual Defendants violated the Code of Ethics by

engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to act with honesty and candor, avoid conflicts of interest, and comply with laws and regulations.

### *Audit Committee Charter*

126.  Workhorse also maintains an Audit Committee Charter which applies to those Individual Defendants that served on the Audit Committee of its Board.

127.  The Audit Committee provides the following about the Audit Committee's responsibilities concerning "Controls and Procedures":

Oversight . The Audit Committee shall coordinate the Board' [sic] oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

Procedures for Complaints . The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

128.  Defendants Budde, Clark, Dedo, and Samuels (the "Audit Committee Defendants"), who served on the Audit Committee, violated the Audit Committee Charter by failing to provide adequate oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and code of conduct and failing to establish adequate procedures to uncover the misconduct at issue. In so doing, the Audit Committee Defendants caused or permitted the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

# INDIVIDUAL DEFENDANTS' MISCONDUCT

## Background

### *The Company's Origins and Financial Condition*

129.   Workhorse is an Ohio-based technology company that focuses on providing environmentally sustainable solutions to the commercial transportation sector. The Company is an American manufacturer that designs and builds battery-electric delivery vehicles and drone systems. The Company's core business is last-mile delivery—the last leg of a journey comprising the movement of goods from a transportation hub to a final destination.

130.   The Company, which was initially based in Kansas, was incorporated in Nevada in November 2007 as a shell company under the moniker Title Starts Online, Inc. The Company went public on July 14, 2009, when its common stock began trading on the OTC Market. On December 28, 2009, the Company acquired 100% of the outstanding securities of Advanced Mechanical Products, Inc. (later known as AMP Electric Vehicles, Inc.) and commenced operations as an electric vehicle manufacturer in Ohio, with Burns serving as CEO, CFO, Treasurer and Secretary. The Company then formally changed its name to AMP Holding Inc. on May 24, 2010. Thereafter, on April 16, 2015, the Company rebranded once again to its latest appellation, Workhorse, and began trading on the NASDAQ.

131.   The Company has incurred net losses every year since its inception, aside from the fiscal year ended December 31, 2020. As of December 31, 2021, the Company had an accumulated deficit of approximately $510.4 million. Workhorse has had negative cash flow from operating activities amounting to $132.6 million, $70.3 million, $36.9 million, and $21.8 million for the fiscal years ended December 31, 2021, 2020, 2019, and 2018, respectively.

132.   According to an article published by *The Verge* on March 1, 2021, despite that the Company has "bled money for years" it has been "able to survive thanks to loans

Verified Consolidated Shareholder Derivative Complaint

from hedge funds and by selling off parts of its business."

133.   The Company's ability to continue to raise money was, in part, thanks to its ongoing participation in USPS's NGDV bidding process. Although Defendants knew early on that Workhorse was not a competitive bidder, for reasons detailed below, the Individual Defendants were successfully able to deceive investors into thinking the Company was.

### USPS Delivery Vehicle Fleet

134.   USPS operates one of the world's largest civilian delivery vehicle fleets, numbering approximately 215,000. However, many of these vehicles, initially produced by Grumman Aerospace Corporation (later Northrop-Grumman) and General Motors, began service in 1986 and are now exceeding their expected service life of 24 years.

135.   As a result, according to the U.S. Government Accountability Office, USPS is "increasingly incurring costs for unscheduled maintenance due to vehicle breakdowns, which can disrupt operations and increase costs." Also, USPS had even been finding it difficult to fill vacancies for mechanics to perform the necessary repairs since new mechanics graduating from vocational schools are not trained to repair older vehicles.

136.   Additionally, according to an article published by *Vox* on April 22, 2020, most of these vehicles lack basic functions such as air conditioning, airbags, or anti-lock brakes and are too small to accommodate the increasing strain (in both size and number of packages) that the growing e-commerce market has exacted on delivery services. Further, it has been widely reported that some of the older postal vehicles have also recently been catching on fire.

### Next Generation Delivery Vehicle Program

137.   In January 2015, to address and replace USPS's aging and costly delivery vehicle fleet, the USPS publicly began the NGDV acquisition process with a Request for Information and a kick-off meeting open to all interested technology and automotive

Verified Consolidated Shareholder Derivative Complaint

suppliers, with the intention of attracting the most innovative and cutting-edge technological solutions.

138.   The Company entered the bidding process with USPS for a contract to build its NGDV. The NGDV contract was to replace USPS's 165,000-vehicle primarily gas-powered fleet—a massive undertaking. In a development emblematic of the early-stage state of the Company, the initial bid submitted by the Company was rejected because Company engineers did not use the design software that USPS required. Rather than drop out at this stage, as many other noncompetitive bidders did, Workhorse determined to proceed despite their inability to meet USPS's requirements.

139.   Notwithstanding the Company's initial failures, Workhorse managed to enter the USPS bidding process by partnering with engineering firm VT Hackney—one of six companies that had made it through the initial bidding phase. USPS planned to extensively test the prototypes submitted by these six contenders, and ultimately award the contract—valued at between $6.3 to $8 billion—based on this testing.

140.   By September 2017, Workhorse and VT Hackney submitted six prototypes to USPS for testing. However, VT Hackney later dropped out of the process once they determined that it would not be profitable for them to proceed. Despite Workhorse being less experienced than VT Hackney and no longer benefitting from their expertise—which is what got Workhorse into the bidding process at all—on November 6, 2019, Workhorse announced that it had purchased VT Hackney's rights for about $7 million and would proceed in their stead.

141.   According to the Company's complaint in its suit against USPS after Workhorse finally lost out in the NGDV bidding process (the "USPS Complaint"), USPS evaluated the proposals by weighing "total cost of ownership, technical evaluation results, and risk," to determine the "best value" to USPS. USPS Complaint at ¶ 34.

142.   "Prototype Performance" constituted a crucial part of the technical evaluation. *Id.* at ¶ 49. Another important component of the technical evaluation was the

"Prior Performance" of the Company, including the "[e]xtent and quality of offeror and key partners/subcontractor(s)['] past performance in both research/development and design production of vehicles[,]" including performance on prior government and commercial contracts of similar size and scope." *Id.* at ¶ 51.

143.   Of note, the Company had *zero* experience dealing with contracts of similar size and scope, either government or commercial; the Company had major operational deficiencies that precluded it from being able to fill a contract on the scale contemplated by the NGDV contract and; the Company's prototype experienced substantial problems early on in testing.

### *The Company's Operations and Prototypes*

144.   Prior to VT Hackney's dropping out of the USPS contract selection process, the Company and VT Hackney delivered six prototypes to USPS. These prototypes were built by a company called Prefix and Workhorse did not have the infrastructure in place to replicate or mass produce these vehicles.

145.   A former Company employee, interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "CW1," worked at Workhorse from January 2020 through June 2020 and was on a team tasked with identifying the parts needed to produce USPS vehicles at scale and to estimate the cost of doing so. CW1 said of the prototypes provided to USPS: "The prototype was nice to look at, but had very little merit for production."[5] CW1 further stated that he had "very little to go on" when he joined Workhorse because there was no detailed design behind the USPS NGDV prototype.

146.   The prototype did not have crucial accompanying documentation that USPS required. For example, there was no detailed design or schematic for the prototype and it

---

[5] The statements attributed to the confidential witnesses in the Securities Class Action are from the "Amended Complaint for Violation of Federal Securities Law" (the "Class Action Complaint") (Securities Class Action, Dkt. No. 64) filed on July 16, 2021.

Verified Consolidated Shareholder Derivative Complaint

lacked documentation about how it was built and how it worked, among other things. This was partly because the Company had no standardized or automated production infrastructure. CW1 was "quite surprised" by the small amount of information the Company had regarding the USPS NGDV prototype it submitted. CW1 stated that the prototype existed as "just a way for Workhorse to demonstrate to the USPS that they had a vehicle that could fulfill the USPS requirements."

147.   Moreover, as would later be revealed by the Fuzzy Panda Report, in a spring 2018 incident, one of the Company's prototype's suffered a parking brake failure, rolled away, and injured a USPS test driver, sending him to the hospital. The Fuzzy Panda Report stated:

> Workhorse rolled a USPS prototype truck down a hill accidently after their parking brake failed causing a union USPS driver to be hospitalized after jumping out of the runaway vehicle. We think this debacle as well as the numerous other "critical failures" we will lay out, destroyed Workhorse's chances of ever landing the USPS NGDV award.

148.   Only after its rejection by USPS would Workhorse later acknowledge this incident occurred (in their own USPS Complaint) labeling it the "posterchild" reason for why the Company's bid was rejected. USPS Complaint at ¶ 11. Naturally, this incident severely negatively impacted USPS's evaluation of the Company's submission along several criteria, including "Prototype Performance." This was years before the start of the Relevant Period.

149.   Prototype testing concluded in December 2019. Despite this earlier disaster, Workhorse—along with all the other bidders in contention—was extended the opportunity to submit a production proposal due July 14, 2020. Of course, Workhorse did not have the capacity to produce vehicles on the scale necessary to fill the order.

150. As the Fuzzy Panda Report would later reveal, the Company's manufacturing operations were in shambles. Fuzzy Panda investigators went to the Company's manufacturing facilities and found "NO Automation," and that "[a]ll truck production and assembly occurs exclusively in Union City," and that it was all done

manually on wooden tables.

151.    Fuzzy Panda investigators also had conversations with Workhorse employees that demonstrated production issues at Workhorse's facilities:

> *Union City, Indiana – September 2020 Investigator invited inside Assembly Line Plant*
> > *Investigator*: Are those trucks for a particular customer?
> > *Employee*: No, those are just show units
> > *Investigator*: What does that mean like they are prototypes?
> > *Employee*: Yeah, they're not production
> > *Investigator*: Are you making any production units for customers right now?
> > *Employee*: No, not right now
> > *Investigator*: Is this the only facility where you make units or if there's another one on site?
> > *Employee*: No, this is the only production line
> > *Investigator*: How many of them they do make in a week or a month?
> > *Employee*: These are just the show units so they're not really doing that

> *Loveland, Ohio – September 2020 Investigator Conversation within R&D facility:*
> > *Employee*: … really most of the production line is in Union City.
> > *Investigator*: Is it manual or automated? Here looks like everything is manual?
> > *Employee*: Here [Loveland] it's all manual, but there [Union City] it's all in a production line.
> > *Investigator*: So 'here's automation there?
> > *Employee*: No, it's still manual, but it's more of a process there, here is more R&D.

152.    Other former employees interviewed by plaintiffs' counsel in the Securities Class Action also noted the Company's poor manufacturing abilities.

153.    "CW2," who reported directly to Defendant Schrader, was an Executive Director of Human Resources at Workhorse from December 2019 through June 2020. CW2 stated that the Company "never had" the ability to mass produce vehicles at its Union City, Indiana manufacturing facility due to there being "no automation, zero

Verified Consolidated Shareholder Derivative Complaint

automation." CW2 reported that workers made the Company's vehicles on wooden tables, and to his knowledge even those vehicles were prototypes rather than production models. Moreover, the Union City, Indiana facility had only twelve total employees and had trouble retaining engineers, with four engineers having left during CW2's employment with the Company.

154.   A video the Company published on April 8, 2020 corroborated the account by CW2, showing Workhorse employees hand assembling vehicle components on wooden benches. The following images are taken from that video:




155.   Another former employee interviewed by plaintiffs' counsel in the Securities Class Action, "CW3," a Materials Manager who worked for Workhorse until February 2021, stated that at the end 2020, there was no assembly line in place and that each vehicle was made by hand, individually. Even by the time CW3 left the Company, Workhorse was "struggling to finish vehicles" and "a lot of parts still required engineering approval."

156.   The Company itself would belatedly admit its poor manufacturing capabilities, when it would announce in press releases that it would fail to meet its lofty production goals for 2020 and 2021.

157.   After submitting its production proposal, the Company received a reply on September 3, 2020. USPS sent an entire "Deficiency List" identifying a number of problems with the Company's proposal and informing Workhorse that "there were additional, unstated issues" not contained in USPS's response. USPS Complaint at ¶ 62. At USPS's request, Workhorse submitted a ninety-nine page Deficiency Response on September 25, 2020. *Id.* at ¶ 63. On October 8, 2020—the same day the Fuzzy Panda Report came out—USPS and the Company met via Zoom to discuss the deficiencies with Workhorse's proposal. The next day, Workhorse called USPS to follow-up and was informed that USPS did not need further information from Workhorse. *Id.* at ¶ 64. Again, on October 21, 2020, Workhorse received another list of issues related to its proposal, specifically related to cost breakdown and maintenance.

158.   All the while, both before and after these communications with USPS—and at all relevant times after the spring 2018 "posterchild" roll-away incident had occurred— the Individual Defendants made and caused the Company to make statements to the investing public posturing as if the Company were a competitive bidder in the NGDV process and that it could meet aggressive production targets (of 300–400 vehicles in 2020 and 1,800 vehicles in 2021), when, based on the foregoing, they knew this was not the case without even disclosing the material setback of the Deficiency List.

159.   CW2 categorized the 2020 production target of 300–400 vehicles as an "absolute lie."

160.   Another former Company employee interviewed by plaintiffs' counsel in the Securities Class Action, "CW4," worked from March 2020 until October 2020 as a "Buyer/Planner." CW4 also stated regarding the touted production target of 300–400 vehicles by the end of 2020, that Workhorse "booked numbers they didn't have."

### The Company's Publicly Touted "Backlog"

161.   As the Company experienced these problems with the USPS NGDV process and with its manufacturing, it also publicly maintained that it had a "backlog" of

thousands of orders that customers were waiting to have filled once the vehicles were manufactured. This created the appearance of far more business than was the case.

162.   However, these purported "orders" were not binding orders, but merely expressions of interest, if they were even that and thus, customers were NOT waiting to have them filled.

163.   As just one example, the Company repeatedly touted a purported 1,000 vehicle deal with package delivery company UPS, referenced in the false and misleading statements identified below. However, per the terms of that deal, which was attached to a Form 8-K filed back on May 30, 2018, UPS had only committed to accepting delivery of 50 prototypes for testing purposes. If and only if those prototypes were deemed acceptable would UPS then move forward with the remaining 950 vehicles, "in [UPS's] sole discretion."

164.   Defendant Hughes signed this deal on the Company's behalf, and thus knew of its terms. Even though the 8-K included the terms of the agreement, the way Defendants repeatedly discussed the "950" backlog created a false impression of growth and progress, with no substance.

165.   Despite Defendant Hughes' knowledge, and the other Individual Defendants knowledge, that UPS had not at any point during the Relevant Period requested the additional 950 vehicles, they consistently made and/or caused the Company to make statements indicating that those additional vehicles were ordered and that, for example, it was only a question of "***when and where UPS would love to take their vehicles first***" rather than a question of ***if*** UPS would seek the additional vehicles. For instance, Defendant Hughes stated with respect to UPS that, "rather than having the first few vehicles go to them, ***we're working with their implementation schedule across the different depots where they're going to place these vehicles*** starting in the California marketplace as we understand it today."[6]

---

[6] All emphasis herein is added, unless otherwise noted.

Verified Consolidated Shareholder Derivative Complaint

166.   Throughout the Relevant Period, the Individual Defendants maintained this deception regarding Workhorse's dead-end relationship with UPS, as well was with additional vendors whose supposed orders were overstated or perhaps nonexistent.

167.   This included a 20-vehicle deal with a startup company, eTrucks LLC ("eTrucks"), a 500-vehicle deal with Pritchard Companies, and a 6,320-vehicle order with Pride Group Enterprises ("Pride"). With respect to the deal with Pride, Defendant Hughes stated, "[o]ur new agreement with Pride marks our largest individual order to-date and expands our sales channel internationally into Canada for the first time," continuing by stating, "[t]his large order solidifies our first-mover advantage and *indicates the heightened interest in our last mile delivery products.*" However, Pride's website PrideTruckSales.com features heavy trucks and semi-trailers, and does not tout the transaction with Workhorse, or its vehicles. Moreover, in Workhorse's press release announcing the "Purchase Order," the Company admits that the order "is subject to various production and delivery conditions," casting doubt on whether Pride will take delivery of the full order.

168.   Since then, on September 22, 2021, the Company announced that it was suspending production of its C-1000 delivery trucks and recalling the *forty-one* vehicles it had delivered, demonstrating the falsity of this touted backlog throughout the Relevant Period.

### Deception at Workhorse Reflects a Pattern of Deception by Defendant Burns

169.   The representations of inflated backlog by Workhorse reflects a pattern of deception by Burns, the Company's former CEO.

170.   Burns resigned as CEO and a director on January 30, 2019, being replaced by Defendant Hughes several days later. Burns left Workhorse to found Lordstown Motors Corporation ("Lordstown"), a startup that seeks to build electric pickup trucks and other vehicles. As noted in the Company's Form 8-K filed with the SEC on February

5, 2019, following his departure from Workhorse, Burns continued serving Workhorse as a consultant.

171.   On November 7, 2019, the Company announced an agreement with Lordstown to license certain intellectual property relating to the Company's W-15 electric pickup truck platform and its related technology, in exchange for royalties, an equity stake in Lordstown, and other consideration. This included a one percent royalty on the gross sales price of the first 200,000 of Lordstown's vehicles sold. Workhorse regularly described and discussed this related party agreement during the Relevant Period in earnings releases and calls.

172.   Just as the purported UPS backlog was inflated at Workhorse, Burns inflated the backlog at Lordstown by using conditional and uncertain pre-orders of the W-15, rebranded the Endurance, to tout Lordstown's strength. At first, Burns stated that Lordstown had 27,000 pre-orders for the truck, later increasing the number to 50,000 and then 100,000 "pre-sold." These statements were picked up by Workhorse, due to the relationship between the two companies. For instance, during an August 10, 2020 earnings call, Defendant Hughes stated that "[t]o date [Lordstown] has disclosed that it has received over 27,000 pre orders for the vehicles representing over $1.4 billion of potential revenue."

173.   As Lordstown, led by former Workhorse CEO Burns, continued to tout the number of purported pre-orders, a merger agreement was announced between Lordstown and DiamondPeak Holdings Corp., a special purpose acquisition company. The deal "came together in weeks," reflecting an apparent lack of due diligence.[7]

---

[7]  https://www.nytimes.com/2021/07/13/business/lordstown-motors-dealmaker.html  (last visited April 6, 2022).

174.   The series of claims by Burns at Lordstown was part of a scheme that has since been exposed and described as "The Biggest Electric Vehicle Scam in History."[8] The misconduct at Lordstown led to investigations by the U.S. Department of Justice and the SEC, as well as a securities class action lawsuit.

175.   Burns' role as Workhorse's former CEO, the connection between Lordstown and Workhorse, and the striking similarities between the inflated backlog claims at the two companies demonstrate a pattern and practice of creating false impressions regarding vehicle orders. As evidenced by the false and misleading statements described herein, this pattern of misconduct occurred throughout the Relevant Period at Workhorse.

**False and Misleading Statements**

***March 10, 2020 Press Release and Earnings Call***

176.   On March 10, 2020, Workhorse issued a press release announcing its financial results for the quarter and full year ended December 31, 2019. The press release touted the Company's vehicle production goal for 2020, which was unrealistic when made, as follows:

> ***We also made meaningful progress in our transition from a development-stage company to a production-focused enterprise***. . . . While our intent had been to deliver initial vehicles in the first quarter of 2020, we were impeded by material supply disruptions related to the global outbreak of the novel coronavirus. Despite these near-term headwinds***, we are setting a 2020 production target of 300-400 vehicles*** and are looking forward to delivering our state-of-the-art truck to our customers.

177.   That same day, March 10, 2020, the Company held a conference call for investors and analysts in which Defendants Hughes, Schrader, and Willison participated. On that call, Defendant Hughes said:

> As of today . . . ***we have the internal capacity to produce two C Series trucks per day*** at our Union City assembly complex. As training continues

---

[8]   https://techstartups.com/2021/05/08/biggest-electric-vehicle-scam-history-lordstown-motors-ev-startup-valued-5-3-billion-now-sec-investigation-alleged-100000-fake-preorders-zero-car-delivery/ (last visited April 6, 2022).

Verified Consolidated Shareholder Derivative Complaint

and substation assembly processes are completed, *we can quickly move to five trucks per day with the ability to scale to as many as 10 trucks per day* before we consider additional automation upgrades.

\*          \*          \*

Our intent is to produce and deliver a limited number of vehicles to our customers in the second quarter and then move to higher volumes and deliveries with *a target of delivering roughly 300 to 400 delivery trucks in 2020.*

178.   Defendant Schrader also stated on the call that:

[Y]ou have to kind of ramp it up slowly; so I think you expect the – the first quarter and the second quarter will be a lot smaller quantities and *will be back loaded towards the fourth quarter in the 300 to 400.* And then, thinking about steady state; I think *what we see from a standpoint to and – is we have basically – we think 200 a month*, it will be kind of steady state production, that kind of gets us to gross margins that you would expect an OEM to have and also profitable state.

179.   On the call, an analyst later asked "what the CapEx needs are of the company to move from 2 to 5 to 10 per week? It sounds like there is some costs involved, so I didn't know what the CapEx budget was for the guidance that you just provided?" To this Defendant Willison answered: "[I]t's only above 10 that we actually would need CapEx. So I think from that standpoint, *we don't need to really any [sic] additional CapEx this year, regarding that the [sic] assembly plant.*"

180.   Another analyst on the call asked "[C]an you give us a sense of the UPS order book, where that stands?" To which Defendant Hughes answered: "[S]o as you know, *UPS being our customer of record for the last several years, they have 1,060 units on order that we are beginning to deliver in anticipation in late Q2 or Q3* this year . . . *this all goes towards building out to that 100 to 200 units a month* where we have a consistent run rate going into 2021 so that we can reach those gross margin positive numbers as well as maintain and increase the run rate from month to month."

181.   Moreover, on the call Defendant Hughes stated of the NGDV bidding process:

I'll provide a brief comment as we always do with respect to the United States Postal Service next generation delivery vehicle program. As many of you are well aware, under our NDA Workhorse is only able to provide information which is already in the public domain. As has been the case throughout this process, any further information or announcements will be issued by the United States Postal Service. We appreciate the continued interest we receive, and we will provide updates to the market as we are able, however, we do not have any updates to share at this time.

182.   The above statements from March 10, 2020 were false and misleading and failed to disclose that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (3) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles. Specifically, Workhorse could not, and would not, be able to reach the touted daily or total production figures in 2020 (or 2021 for that matter) given the extremely poor state of its manufacturing capabilities. In addition, the 1,060 touted "units on order" for UPS did not constitute an actual binding purchase order but merely an expression of interest. Finally, the Defendant Hughes bringing up the NGDV bidding process, and then hiding behind a nondisclosure agreement ("NDA"), implied that the Company was a competitive bidder in the process, when it was not, and the Individual Defendants knew this at the time these statements were made on the Company's behalf.

183.   However, these statements succeeded in fooling investors. Workhouse's share price rose from $2.50 per share at closing on March 9, 2020 to a high of $2.76 per share on March 10, 2020. The analysts at BTIG projected the price to rise to $6 per share and issued a statement saying:

> ***Management provided a 2020 vehicle production guidance target of 300-400 units with initial customer deliveries expected to commence in April*** . . . the company has now transitioned to the C-Series line and is geared (production line and staffed) up for initial production of up to 2 trucks/day which management expects to gradually ramp into the mid-cycle digits by year-end as the supply chain is stream-lined . . . . Our base case

scenario assumes that Workhorse does not secure the USPS contract. *We assume that WKHS is able to produce ~6 trucks/day in 2021 growing to 18 per day by 2023 expanding the union city factory to exit 2025 ~42 per day.*

184.    Analysts at Cowen Equity Research likewise projected the price of Workhorse's share to rise to $6 per share and issued a statement saying:

> Management now anticipates the C-series ramp to start in April as the Company begins to produce and deliver vehicles in earnest . . . . *Management noted that they would ramp up to 10 trucks per day before the need for additional capex to enable higher levels of automation*... The largest near-term binary event for the company is the outcome of the U.S. Postal Service contract. In our view, a positive outcome for the U.S. Postal Service contract would comfortably lead the company to profitability.

### March 13, 2020 10-K

185.    On March 13, 2020, the Company filed its annual report Form 10-K with the SEC for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Hughes, Schrader, Ackerson, Chess, Budde, Samuels, DeMott, and Clark and contained certifications, signed by Defendants Hugues and Schrader, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2019 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

186.    The 2019 10-K stated of the NGDV bidding process:

> *Workhorse was one of the five participants that the United States Postal Service ("USPS") selected* to build prototype vehicles for the USPS Next Generation Delivery Vehicle ("NGDV") project. The USPS has publicly stated that approximately 165,000 vehicles are to be replaced. *In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract. In 2019, the vehicles completed the required testing protocol as specified by the USPS.* The USPS published a Request for Proposals in December 2019 for the Production Program.

Verified Consolidated Shareholder Derivative Complaint

187.   This statement was false and misleading for many reasons. First, Defendants knew that the USPS solicitation of bids was not for "165,000 vehicles to replace" but was specifically an "Indefinite-Delivery, Indefinite Quantity ("IDIQ") for a minimum of 50,000 vehicles and a maximum of 165,000 vehicles." *See* USPS Motion to Dismiss Court of Claims No. 21-14846, Dkt. No. 36 at 6. Second, Workhorse was not "selected" as a bidder in the USPS's process but instead purchased their rights from VT Hackney. Moreover, the Individual Defendants implied that the Company was competitive bidder in the process despite knowing numerous adverse facts which would have made clear that the Company was not a competitive bidder in the process, including that in 2018 a USPS test driver was hospitalized after an accident involving the Company's prototype, that the Company did not have the manufacturing capacity to fill the proposed USPS order in any meaningful way, and that the Company's prototypes suffered from various other deficiencies which made it an unsuitable candidate.

### May 6, 2020 Press Release and Earnings Call

188.   On May 6, 2020, Workhorse issued a press release announcing the Company's financial results for the quarter ended March 31, 2020. The press release highlighted that the Company "[r]eaffirmed [its] previous production and delivery target of 300-400 vehicles in 2020" and quoted Defendant Hughes as saying:

> We will be delivering our C-Series vehicles to customers in the second quarter, and we ***remain on schedule to achieve our target of delivering 300 to 400 vehicles by the end of this year***. To that end, we're in the final stage of preparing a detailed production plan of when we can deploy vehicles into Ryder Systems' sales channel starting in 2020 and into 2021.

189.   On an earnings call with investors and analysts that day, with Defendants Hughes, Schrader, and Willison representing the Company, Defendant Hughes stated that he was "reiterating our guidance of ***300 to 400 delivery trucks produced in 2020.***"

190.   An analyst later stated on the call, "You guys are very straightforward, 300 to 400 was your original guidance, you're reiterating. Obviously, you're hearing something from your customers that gives you confidence." To this, Defendant Hughes

stated: "*[W]e have the backlog out there in the first place with UPS and DHL* . . . if anything, we're seeing customers very positive about our trucks and *it's more, how soon can we get them.*"

191.   Defendant Hughes also stated that disruptions to its supply chain caused by the COVID-19 pandemic were mostly overcome, saying: "[A]t the outset of the COVID-19 pandemic we experienced a series of supply chain disruptions and pushed back our expected initial delivery date from Q1 to our current quarter. . . . At this point, we feel cautiously optimistic that *we are moving past the disruptions to our supply chain.*"

192.   Defendant Schrader echoed this, stating: "[Y]ou can't know exactly what the future will hold exactly with the virus or even with some of the state orders and stuff like that. *I think we feel pretty comfortable with our vendors* and where they're at. *They seem to have weathered the storm.*"

193.   Another analyst asked: "I think the last call as of a month ago or so there was *a discussion from Duane [Hughes] about having the capability of producing two trucks a day.* I didn't know if you could just update us on Union City. *Do you have the staff to do that?*" Defendant Hughes answered: [W]e're fully staffed *with the current staff that could still meet that two units per day.*"

194.   Another analyst asked about if the Company's supply chain could meet the demand imposed by the USPS NGDV contract, if it were to be awarded to Workhorse. Defendant Schrader invoked the NDA and then when pressed stated: "I would think *it's a similar supply chain that would supply the current trucks that would supply a post office vehicle.*"

195.   The above statements from May 6, 2020 were false and misleading and failed to disclose that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing

Verified Consolidated Shareholder Derivative Complaint

capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (3) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles and Defendants knew that fulfillment of these orders was improbable. Specifically, Workhorse could not, and would not, be able to reach the touted daily or total production figures in 2020 (or 2021 for that matter) given the extremely poor state of its manufacturing capabilities. In addition, the "backlog out there in the first place with UPS and DHL," at least with regard to UPS, did not constitute actual binding purchase orders. It was therefore not a question of "how soon can we get them[.]" Moreover, the Company's supply chain was not the main problem in terms of producing vehicles; instead, the Company's manufacturing capabilities were not at the level necessary to produce vehicles at the scale touted. In any event, when the Company later failed to meet its 2020 production targets, the Individual Defendants would then reveal that the Company had not overcome its supply chain problems. Finally, Defendant Schrader's hiding behind the NDA and then implying that the Company could meet an order on the scale of USPS's contemplated 165,000 vehicle contract was false and misleading because it indicated both that the Company would be able to produce that many vehicles and that the Company was a competitive bidder in the NGDV process, neither of which was true.

196.   Analysts responded favorably to these false and misleading statements, indicating the market had been deceived. Cowen Equity Research published a May 6, 2020 report noting:

> After a tough few quarters, we see greener pastures ahead and a potential binary outcome with USPS... Workhorse has thus far successfully managed through the COVID-19 pandemic . ***The company still has a 1,000+ unit order backlog with UPS and DHL*** and is actively engaged with Ryder to penetrate their channel with the new C1000 electric step van. Production has resumed in April and ***the company has staffing to produce 2 trucks per day and continues to target 300-400 for the year***. . . . We remain constructive on shares given the visibility for C-Series deliveries to UPS, W-15 royalties, and optionality of the U.S. Postal Service contract[.]

197.   Likewise, Roth Capital Partners issued a May 7, 2020 statement which said:

Verified Consolidated Shareholder Derivative Complaint

Workhorse is making strong progress towards production of its C-650 and C-1000 all electric trucks, where commercial production should start in 2Q20. ***Mgmt maintained guidance for 300-400 units delivered in 2020, based on a healthy backlog and customers waiting for vehicle delivery.*** (Our 2020 model conservatively factors 150 C-Series deliveries) . . . Mgmt maintained guide for 300-400 vehicles delivered in FY20. Workhorse has been deemed an essential business, and has kept its workforce intact during the COVID-19 pandemic. ***Deliveries are still on track to commence in 2Q20.***

198.   Based in part on these representations, the Company was able to secure an additional $70 million in financing, which it disclosed in a Form 8-K filed on June 30, 2020. While the Company's common stock was only worth $2.95 per share at close on May 6, 2020, after analysts' favorable reports based on Defendants' misleading statements and the new financing was announced on June 30, 2020, the Company's stock price closed that day at $17.39 per share.

199.   On July 14, 2020, Workhorse submitted its bid proposal to USPS.

**July 23, 2020 Press Release**

200.   On July 23, 2020, Workhorse issued a press release that an electronic vehicle startup, eTrucks, had ordered 20 vehicles from Workhorse. The press release quoted Defendant Hughes as saying: "Bill [Hamilton, Managing Partner of eTrucks] and his partner Brian Carr are building a valuable sales and distribution platform for an underserved market. The SMB fleet operator represents a major opportunity for additional sales."

201.   This statement was false and misleading because it failed to disclose that this order, like many of the orders touted in the Company's backlog, was illusory. eTrucks was a month-old company and one of its partners, Brian Carr, ran a staffing firm that Workhorse used to fill internal positions from custodians to engineers. eTrucks website is extremely rudimentary, essentially functions as a Workhorse advertisement, has not been updated since 2020, and still touts on its frontpage the press release announcing the 20-

vehicle order, without noting any delivery.[9] Therefore, upon information and belief, it appears that this 20-vehicle order was never filled, and thus that this announcement served only to create the illusion of business for the Company.

***July 24, 2020 Benzinga Interview***

202.   On July 24, 2020, Defendant Schrader appeared for an interview with online news website *Benzinga*. In the interview, Defendant Schrader said the following of the Company:

> We are actually making, um, ***actually making trucks right now at our Union City, Indiana plant, um, and, uh, and we plan to make 300-400 this year.*** Um, most of those will be at the very end of the year, in the last quarter. Um, and ***we also have a backorder of 1,100***, uh, vehicles so ***we've already got sales out there from UPS and DHL***.

203.   The interviewer asked: "What happens, say hypothetically you don't get the post office contract, um, you've talked about some of your other businesses, where, um, obviously, is your focus going to go from that?" To which Defendant Schrader answered:

> I think it's on the C-Series [truck] and the drone. Again, the post office to me, I always refer to as the cake on the icing, because it's so big, but from a standpoint of uh, ***the actual business what I'll call is the non-post-office business we think is great.***

204.   Defendant Schrader's statements in this interview were false and misleading because: (1) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (2) the 1,100 supposed orders from UPS and DHL in the Company's backlog did not represent binding commitments to purchase vehicles and Defendants knew that fulfillment of these orders was improbable. Moreover, given that the Company's manufacturing deficiencies rendered it unable to be a competitive USPS bidder and would lead to it failing to meet its oft-repeated 2020, and later 2021, production goals, the "actual business" of the Company was not going "great."

---

[9] https://etrucks.webflow.io/ (last visited April 6, 2022).

*August 10, 2020 Press Release, Earnings Call, and Quarterly Report*

205.   On August 10, 2020, the Company issued a press release announcing the Company's financial results for the quarter ended June 30, 2021. The press release highlighted that the Company was "***[r]eaffirm[ing] [its] previous production and delivery target of 300–400 vehicles in 2020.***" The press release also noted that the Company had "[d]elivered two C-1000 electric step vans for initial use through Ryder System, Inc.'s ChoiceLease and SelectCare product lines" and had "[r]eceived [an] initial purchase order for 20 C-1000 trucks from eTrucks LLC, a Cincinnati-based, newly-launched truck buyer, reseller and financier."

206.   Later that same day, August 10, 2020, the Company held a conference call with investors and analysts to discuss the results for the quarter. Defendants Hughes, Schrader, and Willison represented Workhorse on the call. On the call, Defendant Schrader stated: "[T]o be clear, [the] expectation should be, ***the vast majority of our 300 to 400 vehicle production target would be manufactured and delivered by the end of the fourth quarter of this year.***"

207.   Defendant Hughes also stated on the call: "The goal . . . is to considerably shorten timeframes to assemble a C-Series vehicle and ***deliver our target vehicle production of 300 to 400 units later, with a vast majority coming in the fourth quarter.***"

208.   An analyst later asked on the call: "I know you want to get to 100 vehicles a month for the fourth quarter. So is there any sense as to where you might start the quarter? Where you might end the quarter? Whether that ending exit rate is kind of a good place to start for 2021?" To this, Defendant Willison answered: "Really the ramp starts from here and goes up. And ***what we're really looking at is fourth quarter to do 100 a month. But beginning next year, really taking that up a good bit past that, 150 up to 200 a month as the market allows.***"

209.   Asked about the USPS NGDV bidding process, Defendant Schrader employed the now-usual routine, saying "As you know, we can't say anything about the

Verified Consolidated Shareholder Derivative Complaint

post office," but then saying: "So let me say it this way. Is that ***Union City certainly has the ability and the history that can be really any capacity level as it done 60,000 chasses***, I think in its history."

210. On the subject of the eTrucks order first announced in July and again highlighted in the day's press release, Defendant Schrader said:

> Speaking of orders in July, a ***Cincinnati-based company eTrucks placed an initial order for 20 C-1000 vehicles.*** eTrucks is a buyer, reseller and financier of trucking solutions for small to medium sized delivery businesses or SMBs. The SMB fleet operator represents an opportunity for additional sales. And we're looking forward to growing our partnership with another Ohio-based organization to improve last-mile delivery for everyone.

211. Defendant Hughes, also on the subject of the USPS NGDV bidding process, said:

> I'll provide a brief comment, as we always do with respect to the U.S. Postal Service, next-generation delivery vehicle program. As many of you are well aware under our NDA, Workhorse is only able to provide information which is already in the public domain. As has been the case throughout this process, any further information or announcements will be issued by the U.S. Postal Service. We appreciate the continued interest that we are receiving and will provide updates to the market as we are able. We do not have any updates to share at this time.

212. The above statements from August 10, 2020 were false and misleading and failed to disclose that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (3) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles. Specifically, Workhorse could not, and would not, be able to reach the touted daily or total production figures in 2020 given the extremely poor state of its manufacturing capabilities. Moreover, implying that the Company's facilities could produce up to 60,000 vehicles annually was extremely false and misleading. Though the Company's facilities had previously been used by Navistar International ("Navistar") to produce

57

60,000 chasses, this was over a period of seven years, involved a heavily automated process as compared to the Company's handful of employees building vehicles by hand, and represented the construction of just chasses rather than market-ready vehicles. In addition, the Company's backlog, including the eTrucks order, did not constitute actual binding purchase orders but merely expressions of interest (and perhaps not even that in the case of eTrucks). Finally, Defendants Schrader and Hughes again misleadingly implied that the Company was a competitive bidder in the NGDV process and could meet an order on the scale of USPS's contemplated 165,000 vehicle contract, neither of which was true. The Company's manufacturing was nowhere near able to fill an order of that scale and numerous known deficiencies in the Company's submission to USPS made it a noncompetitive bidder.

213. Nevertheless, analysts again responded favorably to these false and misleading statements, indicating the market had been deceived. Analysts at BTIG issued a report in response to the day's new stating:

> WKHS released Q2 earnings (BMO), with our key takeaways being 1) ***WKHS reaffirmed its 300-400 unit production*** target for 2020 (management expects to get to a 100 unit/month run-rate in 4Q20, 2) Cash stands at $105M (following the $70M convertible issuance and exercise of warrants), and 3) ***While the USPS update was boilerplate, it was reported this week Mahindra Motors (Not Rated) has backed out of the ongoing USPS tender leaving just 3 finalists including WKHS*** . . . Also in July ***WKHS secured a 20 unit order with eTrucks***, a newly launched buyer/ reseller which is also viewed as testing ground for customers . . . ***We expect UPS deliveries to start later this year[.]***

214. Colliers International reported that:

> ***The outlook for the shipment of 300-400 units in 2020 was maintained*** . . . All eyes will be on Q3, however, as we believe ***WKHS intends to ship material numbers of units to its initial customers[.]***

215. Cowen Equity Research also published a statement that:

> WKHS delivered its first three C1000 electric step vans in July, including two to Ryder, after the truck received final certification in 2Q. The 2H ramp remains on track and ***management continues to target 300-400 vehicles by***

*the end of the year.* After a tough few quarters, we see greener pastures ahead and a potential binary outcome with USPS. 10% stake in LMC valued at $160mn after SPAC closes . . . ***The company still has a 1,000+ unit order backlog with UPS and DHL and last month received a purchase order for 20 C1000 trucks from eTrucks. Management continues to target 300-400 for the year[.]***

***August 10, 2020 Proxy Statement***

216.   Also on August 10, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

217.   The 2020 Proxy Statement called for shareholders to approve, among other things: (1) the election of Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels; (2) the issuance of the maximum number of shares of the Company's common stock issuable in connection with the potential future (i) conversion of the a senior secured convertible note for the principal amount of $70 million issued pursuant of the Securities Purchase Agreement dated June 30, 2020, and (ii) delivery of shares of the Company's common stock in lieu of cash payments of interest and principal on that note (the "Issuance Proposal"); and (3) the ratification of the appointment of the Company's independent auditor for the fiscal year ending December 31, 2020.

218.   With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it "applies to all of our directors, officers and employees including our Chief Executive Officer and Chief Financial Officer and principal accounting officer."

219.   Moreover, regarding "Board Leadership Structure and Role in Risk Oversight" the 2020 Proxy Statement said:

Our Board has overall responsibility for risk oversight. The oversight is conducted primarily through committees of the Board of Directors, as disclosed in each of the descriptions of each of the committees above and in the charters of each of the committees, but the full Board of Directors has retained responsibility for general oversight of risks.

220.   The 2020 Proxy Statement also stated that the Company's compensation structure was set up to "reward each executive based on individual and corporate performance and to incentivize such executives to drive the organization's current growth and sustainability objectives," while failing to disclose that the Company's share price, and thus its performance, was artificially inflated as a result of the false and misleading statements described herein.

221.   The 2020 Proxy Statement was materially misleading because it failed to disclose that: (1) despite assertions to the contrary, the Code of Ethics did not apply "to all of our directors, officers and employees," or else could be flouted by them with impunity, as evidenced by the numerous false and misleading statements and other violations of the Code of Ethics engaged in by the Individual Defendants; (2) contrary to the 2020 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (3) the Company's performance-based compensation structure was not "reward[ing] each executive based on . . . performance and [] incentiviz[ing] such executives to drive the organization's current growth" but was instead rewarding the Individual Defendants who were breaching their fiduciary duties and improperly increasing their unjust compensation by inflating the Company's performance through the issuance of the false and misleading statements described herein.

222.   The 2020 Proxy Statement was also materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading, by failing to disclose *inter alia*, that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 1,800 vehicles by the

end of 2021; (3) the thousands of supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles and Defendants were aware that their fulfillments were improbable; and (4) the Company failed to maintain internal controls.

223.   As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, reelected Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels to the Board, allowing them to continue breaching their fiduciary duties. Defendants' reelection enabled them to continue to receive compensation for their purported services, which was unjust in light of their continued breaches and oversight failures to prevent the perpetuation of deception on the market when the reality at the Company was no secret.

### August 14, 2020 YouTube Interview

224.   On August 14, 2020, Defendant Schrader sat for an interview with Jack Spencer of the YouTube channel: Jack Spencer Investing.

225.   The video lacked important cautionary language or a safe-harbor warning with the exception of Jack Spencer noting that he was not a financial advisor.

226.   Moreover, Jack Spencer previously made YouTube videos that were mostly focused on fitness and his personal life. Only shortly before this video was published did he begin making videos focused on investing, often promoting Workhorse and Lordstown, another electric vehicle manufacturer, as discussed above.

227.   In fact, the Fuzzy Panda Report identified roughly 420 videos on YouTube promoting Workhorse, from channels which only recently began focusing on investing. Fuzzy Panda believed them to be illegally paid to promote Workhorse stock.

228.   Nevertheless, Defendant Schrader touted in the interview that the Company had hired 115 new employees in mostly engineering and production roles. He also noted that the Company had begun working on refrigerated trucks for grocery deliveries, stating: "We've got a prototype started on that, so it's not only just engineering and

production right now, ***how to get to kind of our three to four hundred this year***, uh, in the fourth quarter, but also thinking about what we're going to do next."

229.   Jack Spencer later asked: "Obviously you guys have your own plant, and it's a fairly massive plant for the stage [Workhorse is] at right now, do you plan on ever having to outsource to Lordstown Motors in order to hit those targets or would that not even really have to be a thought process as of right now?" To which Defendant Schrader responded:

> Well I don't want to use the word 'we'd have to,' I would say it's a great option for us. So like you said ***Union City, Indiana, our factory right there, that used to put out 60,000 chassis*** in the Navistar days and stuff like that so it has – ***it can do probably a very similar amount from the standpoint of trucks.*** I think, uh, what we would look at, um, would be would ***we have to spend capital to maybe automate it a little bit more*** to get the volumes eventually we would want to be.

230.   When asked by Jack Spencer about the NGDV bidding process, Defendant Schrader smiled and responded that he could not comment because of the NDA.

231.   The above representation by Defendant Schrader on August 14, 2020 were materially false and misleading because: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (3) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles. Thus, Defendant Schrader's statements that the Company could meet its 2020 production goal and that the Company's facilities were equipped to produce 60,000 vehicles and only "maybe" needed some additional investment to make that happen were false and misleading, as was his continued implication that the Company was competitive in the NGDV bidding process.

232.   People who watched the video were fooled, as evidenced by their comments. One user wrote, "Literally just increased my shares to 100 for WKHS...let's go!!!"

Another stated that: "£8000 just added to my position off the back of that. Interesting chat about refrigeration and Walmart. That would be massive. Good effort with that Jack!" Yet another commented "Im going to wake up tomorrow with workhorse stock skyrocketing because of this video." Other users clearly took the bait regarding the USPS NGDV bidding process, with one writing: "As someone that's worked for the US government. I can tell you it's a waiting process. Even if he knows the final result it's pretty much classified until the release date. Judging from his demeanor I think he knows some positive news!" Neither Jack Spencer nor Defendant Schrader clarified that this was not the case.

### *August 17, 2020 Podcast Interview*

233.   On August 17, 2020, Defendant Willison appeared for an interview on William Crane's *Innovation* podcast. Defendant Willison stated of the recent $70 million in funding that: "Because of our progress in the EV field, ***because of our associations with UPS and things, we're finally, not only getting the volume of funding, but at rates that are sustainable.***"

234.   In the interview, William Crane asked: "***What do you think led to the company's ability to deliver***, not just to deliver some additional mule vehicles or deliver that first couple of production vehicles, but ***to consistently ship product to the riders of the world? What led to that?***" Rather than correct the premise of the question—by noting that the Company was not consistently shipping product to the riders of the world and instead had produced (much less delivered) only a handful of vehicles—Defendant Willison answered:

> Well, you know, we, we follow, and there's you know, a zillion different design methodologies, but we somewhat follow the Department of Defense preliminary design and review, critical design review, stage gates, and that seems to work well for us. We've really – you know, vernacular ***we talk in engineering about design freeze . . . no, it's good enough, you know, release it, let's get it purchased, get on with things.*** And so that's one of the principles that's allowed us to say, okay, we'll save those ideas for the next version, but we're going to release these now.

235.   The statements on August 17, 2020 were false and misleading because they indicated that the Company's association was far more meaningful than it was and that the Company had produced a design that allowed for selling the Company's vehicles at meaningful scale. Neither assertion was true. The UPS association was a mere expression of interest on UPS's part that committed it to purchasing zero, or close to zero, vehicles, the Company did not have a design ready to mass produce, and the Company was not producing vehicles at a scale to "get [them] purchased" and "get on with things."

### *August 31, 2020 Press Release*

236.   On August 31, 2020, the Company issued a press release announcing that it had formed "strategic agreements [with] both Hitachi America, Ltd. ("Hitachi America") and Hitachi Capital America Corp. ("Hitachi Capital America" or "HCA")." The press release continued that:

> Under these agreements, Hitachi America and other Hitachi Group companies ("Hitachi") will provide an operational assessment of Workhorse's manufacturing, operational and supply chain capabilities, benchmark to best-in-class standards and provide recommendations to Workhorse *that support the Company's increased production requirements.*

237.   The press release further quoted Defendant Hughes as saying: "This alliance with Hitachi comes at an ideal time for Workhorse as we value their best in class innovation and *experience in ramping up production and enabling us in providing a complete solution* to our customers."

238.   This press release was false and misleading because this partnership would not enable the Company to meaningfully increase its production, and Workhorse would fail to achieve either its 2020 or 2021 production goals. Workhorse inability or unwillingness to automate its production facilities would limit its daily and annual production to numbers well below its public representations, and no amount of outside consulting would remedy this undisclosed phenomenon.

### **The Truth Begins Emerging as the False and Misleading Statements Continue**

### *October 8, 2020 Fuzzy Panda Report*

239.   On October 8, 2020, Fuzzy Panda published the Fuzzy Panda Report, revealing many of the operational problems besetting the Company.

240.   The Fuzzy Panda Report disclosed for the first time that VT Hackney sold their NGDV bidding rights to Workhorse due to serious problems that occurred during prototype testing, including issues affecting the vehicles' motors, safety belts, doors, chasses, suspension, range, and power. The Fuzzy Panda Report also disclosed "most notably," the "notorious parking brake failure resulting in a USPS employee being hospitalized" that caused "Workhorse [to] ha[ve] a very strained relationship with the USPS[.]" Specifically, this strained relationship came about because Workhorse failed their initial bid by not using the proper design software and then was 'not telling the post office the 100% truth' and 'misinforming [the USPS] over and over again," about the status of its vehicles and operations. Indeed—and as Workhorse itself would later reveal in its complaint filed against USPS once it lost out on the NGDV contract—"Workhorse was in fact eliminated from the process 'early on.'"

241.   The Fuzzy Panda Report also disclosed that Fuzzy Panda investigators traveled to Union City, Indiana and Loveland, Ohio, where the Company's manufacturing facilities were, and found "NO Active purchase orders being worked on," and that "[e]mployees told us that no purchase orders were currently in production for customers." The investigators further found "NO Automation," and that "[a]ll truck production and assembly occurs exclusively in Union City," and that it was all done manually on wooden tables.

242.   Moreover, the Fuzzy Panda Report disclosed the fictitious nature of the Company's "backlog" of orders, specifically relating to UPS. Upon visiting the Company's manufacturing facilities, Fuzzy Panda's investigator found that only four UPS trucks had been produced and were located behind dumpsters. A Company employee told the investigator that those vehicles were "show units" or prototypes.

243.   Fuzzy Panda also revealed that Workhorse had a history of connections to

illegal paid stock promoters, like it suspected Jack Spencer and others to be, who were hired to "publish dozens of bullish articles on its clients, which appeared to be independent research pieces."

244.   While the Fuzzy Panda Report caused a drop in Workhorse's stock price, the Company's stock soon recovered as news and media outlets discounted the Fuzzy Panda Report because of Fuzzy Panda's short position in the Company's stock. That is, the Individual Defendants had successfully deceived investors that the Company would be able to meet its production targets and that its manufacturing capabilities were more than they appeared, even despite Fuzzy Panda sounding the alarm. Therefore, the Individual Defendants' scheme was able to continue.

### October 15, 2020 Interview

245.   On October 15, 2020, Defendant Schrader was interviewed on TD Ameritrade Morning Trade Live. In this interview, Defendant Schrader said: "Right now we've delivered, you know, a handful of vehicles out there but *we have a plan to build and manufacture and deliver 300-400 this year*, and most of those will come in this quarter right now, and then continue that to *maybe 200 a month or so next year*." Defendant Schrader also said that Workhorse had a 1,100–1,200 vehicle backlog worth $70M that would be delivered "probably sometime in the next 12 months."

246.   These statements by Defendant Schrader on October 15, 2020 were false and misleading given that: (1) Workhorse did not have a "plan," and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020, i.e., approximately ten weeks at the time this statement was made; and (2) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles, so Defendant Schrader was projecting to deliver up to 1,200 vehicles for $70M in the absence of actual sales.

### October 29, 2020 Benzinga Interview and Tweet

247.    On October 29, 2020, Defendant Schrader once again appeared on *Benzinga* for an interview. During the interview, Defendant Schrader said:

> [W]e've got everything in place right now, so we've got the labor and materials coming in, and from our standpoint ***we still have the 300-400 that we have out there, and that's our goal***. Right now we have two facilities, our Union City and our Lordstown location, so yeah, as far as we are going right now, ***we're good on that.***

248.    Asked about the USPS NGDV bidding process, Defendant Schrader first noted he could not discuss specifics because of the NDA, then went ahead and stated "the Post Office is bidding out 165,000 vehicles, so ***it's a huge fleet opportunity. And I think, from our standpoint, it would be transformative,*** right?"

249.    The statements made by Defendant Schrader on October 15, 2020 were false and misleading given that: (1) Workhorse did not, and would not, at any time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020, i.e., approximately eight weeks from the time this statement was made; and (2) the Company was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions. In addition to knowing of the problems when they initially occurred, the Company had by now received a list of deficiencies from USPS on September 3, 2020, identifying numerous problems USPS still had with the Company's submission. This elicited a ninety-nine page response from the Company on September 25, 2020, follow-up discussion on October 8 and 9, 2020, and a request for more information by USPS on October 21, 2020 to which Workhorse responded on October 28, 2021. Thus, now more than ever, Defendant Schrader and the Company knew that implying that the Company was a serious contender in the USPS NGDV bidding process was false and misleading.

### November 9, 2020 Press Releases and Earnings Call

250.    On November 9, 2020, the Company issued a press release announcing its financial results for the quarter ended September 30, 2020. The press release quoted Defendant Hughes as follows:

Previously, we projected 300-400 vehicles to be produced by the end of 2020, mostly in the fourth quarter. ***Although we will still manufacture and deliver vehicles in Q4, it will be a substantially lower amount than our previous guidance*** . . . While we cannot predict the full impact from COVID right now, let alone in 2021, when conditions improve and the coronavirus is no longer a business issue for us and our suppliers, then ***we would anticipate producing approximately 1,800 units in 2021.***

251.   That is, the press release both served to reveal the truth that the Company would not be manufacturing the 300 to 400 vehicles it had been touting all year, while simultaneously more than quadrupling the target for the end of next year. This was false and misleading because the very operational problems which caused the Company to miss the 2020 year-end deadline—lack of automation and personnel at the Company's manufacturing facility—were not resolved and had no reasonable prospect of being resolved quickly enough to project 1,800 vehicles manufactured by the end of 2021. The Company had no concrete plans to resolve these issues and in fact would not resolve them by the end of 2021.

252.   In a separate press release issued by the Company that same day, November 9, 2020, Workhorse announced another new supposed order for 500 vehicles from Pritchard Companies.

253.   The Company held an earnings call the same day, November 9, 2020, with Defendants Hughes, Schrader, and Willison appearing on behalf of the Company. Defendant Hughes addressed the missed end of year target as follows:

We are currently experiencing new positive cases on a daily basis and having more than ***36% of our production-related staff currently out***, we must protect our employees' health, which requires us to modify the assembly process and limit production support and access to our facilities from the third-party sources. ***Second is the inability of our primary battery supplier to meet our volumes due to capacity issues and COVID-related slowdowns.***

254.   Defendant Willison elaborated on the battery issue by stating:

We always have a backup supplier. We have had very good luck with our primary and it is certainly not a performance issue. But ***we are looking***

1    *because of our volume and increased orders for secondary suppliers.*

2    255.   Defendant Hughes was now focused on the unrealistic, and ultimately

3    unmet, target of 1,800 vehicles by the end of 2021, stating: "If conditions improve, and

4    the virus is not an issue for us or our suppliers going forward, then *we would anticipate*

5    *producing 1,800 units in 2021.*" Echoing this statement, Defendant Schrader noted that:

6    "I think you could look at it as getting to 100 trucks per month by [] no little later than the

7    first quarter of 2021 and then getting to 200 trucks a month by no later than the second

8    quarter of 2021.

9    256.   Asked about the Company's supposed relationship and proposed delivery

10   timeline with UPS, Defendant Hughes stated: "UPS remains our premier customer . . .

11   We are happy where we are with UPS. We will be delivering new vehicles."

12   257.   Asked about the announcement that day of a 500-vehicle order by Pritchard

13   Companies, Defendant Hughes stated:

14       So they [Pritchard Companies] will find their own end-user customers as
         they always do. I mean they already have a group. They sell many trucks to
15       FedEx ground contractors as well as beyond that. So that 500 number is a
         pretty small number in their mind in terms of number of units to sell.
16

17   258.   Regarding the Company's position in the USPS NGDV bidding process,

18   Defendant Hughes stated:

19       I will provide a brief comment as we always do with respect to our ongoing
         participation in the U.S. Postal Service's next-generation delivery vehicle
20       program. As many of you are well aware, under our NDA, Workhorse is
         only able to provide information, which is already in the public domain. As
21       has been the case throughout this process, any further information or
         announcements will be issued by the U.S. Postal Service. We appreciate the
22       continued interest we receive, and we will provide updates to the market as
23       we are able. At this time, we do not have any updates to share.
24
     259.   These statements from November 9, 2021 were false and misleading
25
     because: (1) Workhorse was not truly competitive in the NGDV process, given the
26
     known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse
27
     did not, and would not, at any foreseeable time have the manufacturing capacity to
28

produce anywhere near 300–400 vehicles by the end of 2020 or 1,800 vehicles by the end of 2021; and (3) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles. Regardless of the COVID-19 infection rates among the Company's workforce and the supply chain disruptions to its battery supplier—supply chain disruptions which the Individual Defendants specifically stated the Company had avoided on May 6, 2020—Workhorse was not in a position to meet a 300–400 vehicle production target by the end of 2020 due to the lack of sufficient automation and personnel at its manufacturing facilities. That is, even had these cited problems not occurred at all, the Company's continued lack of automation would still have prevented the Company from reaching this goal, and in fact would prevent the Company from reaching its new goal of 1,800 vehicles by the end of 2021. In fact, as Defendant Schrader remarked in answer to a question on the November 9, 2020 call, the Company had only delivered seven vehicles in the third quarter of 2020. Moreover, the supposed orders from UPS were illusory in that they were nonbinding expressions of interest. UPS had not indicated to the Company that it would be following through on the 1,000 vehicles, and it was misleading to state that the Company would be delivering vehicles to UPS in 2021 in light of that and in light of the fact that UPS had already decided to purchase vehicles from another company. Likewise, upon information and belief, the 500-vehicle order from Pritchard was just another instance of the Company inflating its backlog with nonbinding expressions of interest. It remains unclear if Pritchard paid for any portion of those vehicles or if it is contracted to receive any deliveries. Finally, despite bringing up the topic again to imply that it was a competitive bidder in the USPS NGDV process, the Company was not in fact a competitive bidder, given the numerous deficiencies with its submission. These deficiencies which were known to Workhorse, and USPS had communicated to Workhorse about them on numerous occasions.

### November 14, 2020 YouTube Interview

260.  On November 14, 2020, Defendant Schrader again appeared on Jack

Spencer Investing to discuss Workhorse, and again the representations made were not accompanied by cautionary or safe-harbor language, other than to note the Jack Spencer was not a financial advisor.

261.   During the interview the following exchange occurred between Jack Spencer and Defendant Schrader regarding the new vehicle production timeline (in which Jack Spencer refers to Workhorse as "we" for reasons unclear):

> <u>Spencer:</u> ***In regards to those 1,800 vehicles for next year***, I know you were saying, you know, hopefully you want to be at 100/month within the first quarter then 200 a month in the second quarter. ***Is that based off, you know, the existing backlog of orders we have***, is that, you know, what we would deem to be best case scenario, or could that potentially go up if there are to be more orders?

> <u>Schrader:</u> Well let me say first, the goal was to get like 100/month in Q4, in this year, and I – I think, you know, ***we articulated both the battery constraint issue and the COVID issues*** we've had, and we're not going to do that, but ***we kind of view that more as just a slight delay and hiccup*** and it moved that more to the first quarter, so yeah, ***by the end of the first quarter we'd like to have 100 per month, 100 per month at least, and the same thing by the end of the second quarter 200 per month... So right now the 1,800 is our goal for the year*** and let's, let's shoot for that, and uh, you know, if we get more orders that's beyond the 1,700 – because ***if we did 1,800 that would satisfy the backlog, correct?*** – but if we get more beyond that then certainly we'll look at ways to speed it up, or, you know, they can at least get on the list for 2022.

262.   In addition, Defendant Schrader discussed the issue with the Company's battery supplier stating that around October 1, 2020 "our battery manufacturer basically said – you know – we can't hit that three to four hundred[.]"

263.   The above statements by Defendant Schrader on November 14, 2020 were false and misleading and failed to disclose that: (1) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 1,800 vehicles by the end of 2021; and (2) the supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles and Defendants knew that

Verified Consolidated Shareholder Derivative Complaint

fulfillment of these orders was improbable. Regardless of the COVID-19 infection rates among the Company's workforce and the supply chain disruptions to its battery supplier, Workhorse was not in a position to meet a 300–400 vehicle production target by the end of 2020 or to reach its new goal of 1,800 vehicles by the end of 2021 due to the lack of sufficient automation and personnel at its manufacturing facilities. Moreover, stating that 1,800 vehicles "would satisfy the backlog" was misleading because the backlog did not consist of actual orders. Finally, Defendant Schrader represented that by October 1, 2020, the Company's battery manufacturer informed Workhorse that it could not supply enough batteries for 300 to 400 vehicles. Thus, Defendant Schrader was either being dishonest on October 15 and 29, 2020 when he said the Company was on track to make 300–400 vehicles, or he was being dishonest now in explaining why the initial target was missed.

264.   Nonetheless, the comments to the video show the deception continued to work. One user wrote: "I get a good vibe from this guy. I love when the 'top dogs' are accessible to the public. I'm actually going to buy in at open today." Another wrote: "I was going to sell my workhorse but now I am keeping it long run." Yet another wrote: "Definitely got the usps contract[,]" which elicited another user to reply: "USPS definitely. 100% of the award would be amazing!" Neither Defendant Schrader nor Jack Spencer clarified that they were not representing that the Company had secured the USPS contract, despite Jack Spencer personally replying to a number of comments.

### *January 27 and 28, 2021 YouTube Interviews*

265.   On January 25, 2021, recently-inaugurated President Biden announced plans to transition the government's civilian fleet of vehicles to electric power.[10] Though his announcement did not mention Workhorse specifically, the market took this as a positive sign for the Company's business, and its share price rose from $24.71 per share at close on January 25, 2021 to close the next day, January 26, 2021, at $32.18 per share—a more

---

[10]   https://www.cnbc.com/2021/01/25/biden-plans-to-replace-government-fleet-with-electric-vehicles.html (last visited April 6, 2022).

Verified Consolidated Shareholder Derivative Complaint

than 30% increase.

266.    On January 27, 2021, Defendant Schrader joined Simranpal Singh, the host of another popular YouTube channel that focuses on investing. The interview lacked meaningful cautionary or safe-harbor language aside from noting that Simranpal Singh was not a financial advisor. During the interview, Defendant Schrader stated the following: "It's positive what we're seeing from the administration, you know, *President Biden just five days into his presidency has kind of pushed electric vehicles for all government agencies.*" Later in the interview Defendant Schrader described possible divisions for Workhorse including: "a drone division, a truck division, um, you know, *maybe a governmental division of some sort.*" One user took this as a hint about the USPS bidding process, writing: "Did anyone catch that? He said around 14:20, the different divisions 'drone division, truck division, maybe a governmental division of some sort.'" The host, Simranpal Singh, not only did not clarify but responded instead: "Yea I thought that was interesting too!"

267.    On January 28, 2021, Defendant Schrader joined Jack Spencer one more time for another interview. Again, the interview lacked meaningful cautionary or safe-harbor language aside from noting that Jack Spencer was not a financial advisor. During the interview, Defendant Schrader said:

> *Yeah, I think the President's announcement was huge, for several reasons, right?* It's, one, supportive of the E.V. ("electric vehicle") market. It's, two, all-American, like you said, all-American product buy. And I think he also said a lot about small businesses, and purchasing, whether it be parts or final products, from small businesses, too. *So, I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait and so I think that, putting a move on that was very quick too.*

268.    Later in the interview, Jack Spencer asked if there were lingering effects of the COVID-19 pandemic on the Company's manufacturing processes, to which Defendant Schrader answered:

> [I]t cost us, basically, five weeks... So you know, it – *it really just kind of*

*killed the fourth quarter*, you know . . . I had a virus, I was out for four or five days. Never had COVID, but you know, it just shows kind of how it is, you know, and I'm not, you know, ***I'm not meaningful for production so they can spare me . . . but when it's production people out, you know, that's just the killer.***

269.   These statements by Defendant Schrader on January 27 and 28, 2021 were false and misleading for implying that the Company was well-positioned to win the USPS NGDV contract. As stated, the Company was not a competitive bidder in the USPS NGDV process, despite bringing up the topic again to imply that it was, given the numerous deficiencies with Workhorse's submission. These deficiencies were known to Defendants, and USPS had communicated to Workhorse about them on numerous occasions. In addition, regardless of the COVID-19 infection rates among the Company's workforce and attendant disruptions, Workhorse was not in a position to meet a 300–400 vehicle production target by the end of 2020 or to reach its new goal of 1,800 vehicles by the end of 2021 due to the lack of sufficient automation and personnel at its manufacturing facilities; thus, it was false and misleading to suggest that COVID-19 was the cause of the Company's missed goals.

270.   Again, the deception proved effective. One user commented on the Jack Spencer video "I am 80% sure that Jack talked with him about Usps and now he knows the result. Jack wouldnt share this video that proudly if he didnt know that Wkhs didnt have the contract. ;) Jack?" Jack Spencer never replied to clear the air despite replying to many other comments.

**The Truth Continues to Emerge**

**as Defendants' False and Misleading Statements Continue**

271.   On February 23, 2021, USPS issued a press release titled, "U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet" announcing that the USPS had awarded the entire NGDV contract to Oshkosh.

272.   From the market's close on February 22, 2021, to its opening on February

74

Verified Consolidated Shareholder Derivative Complaint

24, 2021, the Company's stock dropped $17.27, or approximately 55.1%, from $31.34 per share to $14.07 per share, reflecting just how significant the statements drumming up Workhorse's chances at winning the bid were to the investing public.

273.   Still Defendants continued to fan the flames to stimy the stock damage. On February 24, 2021, Workhorse issued a press release noting that it planned to sue USPS over the contract selection process, stating:

> On February 23, 2021 the USPS issued a press release announcing that it has made an award under the NGDV contract to a competing finalist. . . . After being informed of the USPS decision, the Company has requested, pursuant to the bid process rules, additional information from the USPS and is awaiting a response at this time. The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process.

274.   This statement was false and misleading for implying that the Company was ever well-positioned to win any portion of USPS NGDV contract, and therefore that the Company had meaningful recourse for not having been selected. As stated, despite the Company bringing up the topic again and again to imply that it was a competitive bidder, Workhorse was not a competitive bidder in the USPS NGDV process, given the numerous deficiencies with its submission. These deficiencies were known to Defendants, and USPS had communicated to Workhorse about them on numerous occasions.

275.   While analysts were taken aback, many still assured investors that the Company's fundamental business was sound, demonstrating that they still believed the Company's false representations about its manufacturing capacity and backlog. For example, Cowen Equity Research still set a target for Workhorse's stock at $18 per share, noting "[w]hile we were not modeling success in the USPS, we had anticipated Workhorse would play a role, especially given the administration's stance around government fleets being zero emission . . . *The loss of the contract does not impact our estimates* as we had elected not to model the USPS NGDV program[.]"

276.  BTIG likewise issued a statement setting a price target of $24 per share, which included valuing at "*$20/share for the core business* which includes the C-Series delivery truck (*existing backlog of ~8,000 vehicles*)."

277.  Colliers International also put out a statement noting: "*There is still a real company here.* As we do with all un-signed contracts, un-closed mergers, and so on, we never included the USPS contract in our WKHS model or valuation. As such, *our estimates are not changing at this time.*"

278.  Similarly, Roth Capital Partners issued statement that, while "the unsuccessful Workhorse bid for the USPS NGDV [was] a surprise outcome," they were "[l]eaving forecasts unchanged at this time as *the NGDV was never in our revenue or earnings forecast.*"

279.  In light of this response—caused by the Individual Defendants' successful deception as to the purported core operations of the business which remained intact even despite losing out on the USPS contract—by close of markets on February 25, 2021, Workhorse's stock had rebounded to $18.87 per share.

### *March 1, 2021 Press Release and Earnings Conference Call*

280.  On March 1, 2021, the Company issued a press release to announce its financial results for the fourth quarter and full fiscal year ended December 31, 2020. The press release quoted Defendant Hughes as saying:

> Our management team and expanded production workforce are continuing to collaborate closely with our strategic partners, Hitachi and Belcan. We are currently faced with various supply chain challenges, both internal and external, in the ramp-up to our stretch production goal for 2021. While we focus on our near term targets we are preparing the Company for quality needed in the scaling forecasted in our multi-year growth plan.

281.  The press release also noted a new supposed order in the Company's backlog, stating that Workhorse "[r]eceived *a purchase order for 6,320* C-Series all-electric delivery vehicles from Pride Group Enterprises" which made the backlog 8,000 orders according to the Company.

282.   On the earnings call with investors and analysts the same day, March 1, 2021, Defendant Hughes said of the Company's new 1,800-vehicle production goal: "[W]e are facing various supply chain challenges, both internal and external, and the ramp up to that goal. While *we believe this is a feasible goal*, it's a stretch."

283.   Defendant Schrader added that "*we're trying to get to a target of three a day*, sometime here at this month. And then also, *we kind of will continue to keep out our 10 a day by the end of sometime in June or by the end of the second quarter*. So, that's kind of our goal."

284.   Asked by an analyst about the Company's UPS-backlog, Defendant Schrader said: "UPS, it's a combination, obviously we haven't got production now, but also is *when and where UPS would love to take their vehicles first* . . . ideally, I think their first trucks would ideally go to California."

285.   Of the newly announced "order" for Pride Group Enterprises ("Pride"), Defendant Hughes reiterated that "Pride Group... placed a 6,320-unit order that includes both C-1000 and C-650 electric vehicles[,]" bringing the backlog to 8,000 vehicles.

286.   The statements made on March 10, 2021 were false and misleading and failed to disclose that: (1) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 1,800 vehicles by the end of 2021 and had no plans to make the necessary staff and automation investments to make this possible; and (3) the 8,000 supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles and Defendants knew that fulfillment of these orders was improbable. The Company acknowledged that the Pride order was "subject to various production and delivery conditions" but when a reporter from an automotive news website, Freightwaves.com, asked about these terms and conditions, their inquiry went unanswered. Pride's website, PrideTruckSales.com, does not have information about acquiring Workhorse vehicles. Thus, it appears to just be another in a long line of touted "orders" which in fact are not binding commitments at all.

### The Truth Emerges

287.  On May 10, 2021, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2021. In the press release, the Company revealed that it had produced thirty-eight vehicles year-to-date, or just over 2% of the target despite it being May. This made clear that the 1,800-vehicle target was impossible and that the Company's manufacturing operations were far less developed than the Individual Defendants had caused the Company to represent for well over a year.

288.  On this news, the Company's stock price closed on May 10, 2021 at $8.20 per share, down from $9.64 per share at close the day prior and down from an intra-Relevant Period high of $42.96 per share.

### *Subsequent Developments*

289.  On June 28, 2021, Workhorse filed the USPS Complaint against the United States in the Court of Federal Claims. The USPS Complaint largely acknowledged that the Company was never a viable contender to win the NGDV contract. In the USPS Complaint, Workhorse itself alleged that USPS cited numerous reasons that USPS "would never have selected [Workhorse's NGDV] for its flagship vehicle," including the "posterchild" "roll-away incident," when, according to USPS, "a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch," resulting in the hospitalization of a union USPS driver. USPS Complaint at ¶ 11. The USPS Complaint admitted that on a number of occasions during the Relevant Period —including on September 25, 2020; October 8–9, 2020, October 21, 2020; and October 28, 2020;—USPS and Workhorse communicated about various "areas of deficiency," including USPS providing a "Deficiency List" that "identified issues" including about Workhorse's "prior performance," "Workhorse's ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial delivery," the "production capabilities of Workhorse's leadership and partners," and "Workhorse's cost breakdown." *Id.* at ¶¶ 63, 65, 93, 95, 101–64.

290.   These problems, and the "roll-away incident," implicated the "Technical Evaluation Factors" used by USPS, which USPS's Solicitation explained "would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS." *Id.* at ¶¶ 36–37. As a result, Workhorse scored in last place in Technical Ranking and Best Value Ranking among the NGDV competitors. *Id.* at ¶ 81.

291.   When Workhorse submitted a formal "disagreement" to the USPS award, USPS responded with, according to Workhorse, "a lengthy screed aggressively attacking Workhorse," and its "lack of credibility and candor with the Federal government." *Id.* at ¶¶ 75–76, 88. USPS noted the "'critical' deficiencies in Workhorse's proposal," and "castigated Workhorse" discussing so regularly its "participation in the NGDV program" despite having signed the NDA that the Individual Defendants cited so often before when publicly discussing the NGDV program. *Id.* at ¶¶ 77, 89. USPS's response to Workhorse "made clear" that USPS had "closely policed Workhorse's public statements," and referenced "securities fraud lawsuits" among many reasons that USPS denied Workhorse's proposal and would have "even if the USPS had rated its proposal the best value." *Id.* at ¶ 89.

292.   The USPS Complaint further revealed that USPS identified "major" and "significant weaknesses" in Design Quality and Technical Approach. *Id.* at ¶¶ 101, 107. Indeed, the USPS Complaint reveals that USPS identified deficiencies in Workhorse's submission with respect to evaluation subfactors that included Reliability, Maintainability, Safety & Ergonomics, Engineering Capability, Production & Delivery, Service & Parts, Quality, Past Performance, Prototype Performance, and Prior Performance. *Id.* at ¶¶ 101–44. The USPS Complaint revealed that the USPS "faulted Workhorse for building fewer than 1,000 vehicles" and considered Workhorse a "'startup' company without the experience or capability to produce the NGDV." *Id.* at ¶¶ 85, 144. Of course, Defendants were already aware of these facts internally.

293.   On September 14, 2021, Workhorse voluntarily dismissed the USPS

Verified Consolidated Shareholder Derivative Complaint

Complaint, demonstrating the weakness of their case, the validity of USPS's concerns, and the non-competitiveness of the Company's bid throughout the Relevant Period, even as the Individual Defendants represented otherwise.

294.   On September 22, 2021, the Company acknowledged in a press release that it had suspended vehicle production for the C-1000 trucks which it had touted through the Relevant Period and recalled the mere *forty-one* vehicles that it had managed to deliver to date, further demonstrating the impossibility of ever having produced 300—400, much less 1,800, vehicles in a year.

295.   On October 19 and November 1, 2021, the Company received letters from the SEC requesting voluntary provision of information concerning the USPS NGDV bidding process and recognition of revenue related to purchases of Workhorse vehicles by certain customers.

296.   On November 5, 2021, the Department of Justice ("DOJ") orally informed the Company that it had opened a related investigation concerning the Company.[11]

**The Individual Defendants Engage in Improper Insider Sales**

297.   While the Company's stock was trading at artificially inflated prices during the Relevant Period, Defendants Samuels, Hughes, Fleming, Willison, Furey, DeMott, Chess, Budde, Ackerson, Schrader, and Mader each made insider sales while in possession of material nonpublic information. Collectively, they sold 2,643,431 shares at artificially inflated prices for proceeds of more than $61.4 million.

298.   On July 13, 15, and 17, 2020—approximately two weeks after the Company announced its new round of financing on June 30, 2020, which sent the price of the Company's common stock skyrocketing—Defendants Hughes, Fleming, Furey, Chess, and Willison made substantial sales of Company common stock. Defendant Hughes sold 62,513 shares on July 13, 2020 for proceeds in excess of $1.0 million. Defendant Fleming

---

[11]   https://www.reuters.com/legal/litigation/workhorse-discloses-doj-sec-probe-related-usps-contract-2021-11-08/ (last visited April 15, 2022).

Verified Consolidated Shareholder Derivative Complaint

sold 40,000 shares on July 13, 2020 for proceeds of approximately $659,000. Defendant Furey sold 30,000 shares on July 17, 2020 for proceeds in excess of $490,000. Defendant Chess sold 27,365 shares on July 15, 2020 for proceeds in excess of $447,000. Defendant Willison sold 19,920 shares on July 15, 2020 for proceeds in excess of $325,000. Thus, they each sold substantial amounts of Company common stock at artificially inflated prices while in possession of material, nonpublic information about the Company's production goals, manufacturing capabilities, and backlog. None of these Defendants made any prior sales of their stock before this time period.

299.   Likewise, on October 15, 2020, Defendant Schrader appeared on TD Ameritrade Morning Trade Live and made false and misleading statements about the Company's production goals and manufacturing abilities. Over the course of October 15 and 16, 2020, Defendants Hughes, Fleming, Furey, and Chess made lucrative insider sales. Each of Defendant Hughes, Fleming, and Furey sold 50,000 shares for personal proceeds of $1,150,000 each on October 16, 2020 (that is, they collectively sold 150,000 shares for $3,450,000). On October 15, 2020, Defendant Chess also sold 4,000 shares of Company common stock for proceeds of approximately $90,000. Thus, they each sold substantial amounts of Company common stock at artificially inflated prices while in possession of material, nonpublic information about the Company's production goals, manufacturing capabilities, and backlog.

300.   Again, on January 26, 2021, the day after President Biden's announcement drove the Company's stock up and just a day before Defendant Schrader's false and misleading YouTube interviews with Simranpal Singh was published—and less than a month before the award of the USPS contract to Oshkosh Defense was announced—Defendant Samuels sold 299,997 shares of Company common stock for almost $9.0 million, Defendant Hughes sold 200,000 shares of Company common stock for $5.8 million, Defendant Willison sold 150,000 shares of Company common stock for $4.5 million, and Defendant Budde sold 10,000 shares of Company common stock for nearly

$1.2 million. The next day, January 27, 2020—that is, the day of Defendant Schrader's interview on YouTube with Simranpal Singh—Defendant Ackerson too sold 6,445 shares of Company common stock for more than $241,000. Thus, they each sold substantial amounts of Company common stock at artificially inflated prices while in possession of material, nonpublic information about the Company's production goals, manufacturing capabilities, and backlog.

301.   The amount and timing of these sales, and the other sales identified above, by Defendants Samuels, Hughes, Fleming, Willison, Furey, DeMott, Chess, Budde, Ackerson, Schrader, and Mader demonstrate their knowledge of the falsity of the statements at issue and of their own and the other Individual Defendants' misconduct. Each Individual Defendant's insider sales represented the disposal of significant percentages of their holdings of Company common stock during the Relevant Period. The sheer scale of their insider sales demonstrates that the identified Individual Defendants chose to profit from this wrongdoing, rather than remedy or disclose it.

302.   While some stock sales may have been made pursuant to various 10b5-1 plans for the respective Individual Defendants that engaged in improper insider selling, 10b5-1 plans do not provide a defense or immunity if the plan was adopted while the seller was in possession of material non-public information or made the sale in bad faith as is alleged here.

303.   This is especially true here because certain Individual Defendants clearly possessed material adverse non-public information at all relevant times through the dates identified herein and thus any 10b5-1 plans were conceived while in possession of such material adverse non-public information. Ultimately, plans and amendments to Rule 10b5-1 plans will serve as a defense to insider trading ONLY if the modifier does not possess material non-public information at the time of the modification and meets all of the elements required at the inception of the plan. Modifications can sometimes indicate

that the person is manipulating the plan to benefit from material non-public information, jeopardizing the good faith element and the availability of the affirmative defense.

### The Securities Class Action Overcomes a Motion to Dismiss

304.   On December 2, 2021, the Court in the Securities Class Action denied in substantial part defendants' motion to dismiss the Class Action Complaint (the "MTD Order"). Securities Class Action, Dkt. No. 74. The Class Action Complaint is based on substantially the same statements and misconduct at issue in this action.

305.   In denying the motion to dismiss, the Court stated in the MTD Order that:

> Plaintiff alleges that Defendants' statements indicating Workhorse was still a viable contender for the USPS contract were misleading because Defendants knew they had little to no chance of securing the contract, given their inability to manufacture a large volume of vehicles and the fact that their prototypes had suffered numerous failures during testing, including parking brake failures. . . . Plaintiff has sufficiently alleged a misrepresentation in this regard.

MTD Order at 7.

306.   In reaching this conclusion, the Court specifically stated that "Plaintiff plausibly alleges sufficient facts indicating that Defendants could not have genuinely or reasonably believed that Workhorse had a real chance at securing the USPS contract, or that Defendants were aware of undisclosed facts tending to seriously undermine their ability to secure that contract" including defendants knowledge of "an undisclosed parking brake failure during prototype testing caused Workhorse's prototype vehicle to roll down an incline and into a ditch, resulting in the hospitalization of a USPS driver[,]" that "Defendants knew Workhorse was not capable of producing trucks on the scale required to win the contract[,]" that "on September 3, 2020, USPS sent Workhorse an undisclosed 'deficiency list' identifying various 'questions and weaknesses' with Workhorse's proposal," and that "on October 21, 2020, USPS sent Workhorse another email with another list of issues related to Workhorse's proposal." *Id.* at 7–8.

307.    Likewise, the Court found that "Plaintiff alleges that Defendants made material misrepresentations regarding Workhorse's manufacturing capability. Specifically, Defendants misrepresented that Workhorse had the capacity to meet the production requirements of the USPS contract, and stated that they would be able to produce 300 to 400 trucks in 2020. These statements also sufficiently allege misleading representations." *Id.* at 8 (citation omitted). In making this finding, the Court relied on the fact that "Workhorse produced only 7 trucks in the third quarter of 2020, 18 trucks for the whole year of 2020, and 38 trucks year-to-date by May 10, 2021" yet "[d]espite these low numbers, Workhorse claimed over and over that it would be able to produce 300-400 trucks by the end of 2020. . . . CW2 stated that this claim was an 'absolute lie,' as there was 'no way' Workhorse would have been able to meet this target because there was 'no automation.'" *Id.* at 9 (citation omitted).

308.    Moreover, the Court noted that "Plaintiff challenges Defendants' false representations that Workhorse had a 'backlog' of vehicle orders, which created the illusion of firm customer orders when they were really non-binding expressions of interest" including Defendant Hughes stating "on March 10, 2020 that UPS 'had 1,060 units on order' . . . even though he knew that Workhorse did not have the capacity to produce that many vehicles, and that UPS had not actually requested delivery of the vehicles" and Workhorse announcing on March 1, 2021 that "it received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises, raising the backlog to 8,000 vehicles[.]" *Id.* at 11. The Court found that: "These statements too sufficiently allege misrepresentations." *Id.*

309.    Given the Court's finding in denying in substantial part defendants' motion to dismiss the Class Action Complaint in the Securities Class Action, Plaintiffs state viable claims here based on the same misconduct and likewise demonstrate the Individual Defendants' knowledge of the wrongdoing.

310.   Even for those Individual Defendants not named as defendants in the Securities Class Action, the Court found that their joint tortfeasors—Defendants Hughes, Schrader, Willison, and Ackerson—had sufficient knowledge of the events in question to justify the claims against them proceeding past a motion to dismiss. Given that the remaining Individual Defendants had access to the same information and knowledge as Defendants Hughes, Schrader, Willison, and Ackerson, and especially given the materiality of the USPS contract to the Company, the Court's findings in the MTD Order strongly support an inference that the remaining Individual Defendants likewise knew of the wrongdoing at issue, yet did nothing to prevent the issuance of further false and misleading statements, correct the false and misleading statements already issued, or fix the Company's clearly inadequate disclosure controls.

## DAMAGES TO WORKHORSE

311.   As a direct and proximate result of the Individual Defendants' conduct, Workhorse has lost and expended, and will lose and expend, many millions of dollars.

312.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and four of its current and former officers, investigations by the DOJ and SEC, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

313.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, severance payments made in connection with Individual Defendants' departure from the Company, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

314.   As a direct and proximate result of the Individual Defendants' conduct, Workhorse has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the

Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

315.   Plaintiffs bring this action derivatively and for the benefit of Workhorse to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Workhorse, unjust enrichment, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

316.   Workhorse is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

317.   Plaintiffs are, and have continuously been at all relevant times, shareholders of Workhorse. Plaintiffs will adequately and fairly represent the interests of Workhorse in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

318.   Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

319.   A pre-suit demand on the Board of Workhorse is futile and, therefore, excused. At the time of filing of this consolidated complaint, the Board consists of Defendants Budde, Chess, Clark, Dedo, DeMott, Mader, and Samuels (collectively, the "Director-Defendants"), and nonparties Richard Dauch ("Dauch") and William G. Quigley III ("Quigley") (collectively with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors that were on the Board (the "Demand Board") this consolidated complaint was filed.[12]

---

[12] If instead the Court determines that the proper time to analyze demand futility is when the initial complaint was filed, the Board at that time consisted of the same seven

320.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, during which time Director-Defendants Budde, Chess, DeMott, Mader, and Samuels engaged in lucrative insider sales based on material nonpublic information, netting proceeds of approximately $30.3 million. This scheme renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

321.   The insider trading engaged in by five of Workhorse's nine sitting directors at the time of the consolidated complaint constitutes disloyal self-dealing in breach of the Director-Defendants' fiduciary obligations which cannot be exculpated under any provisions of Workhorse's Charter by-laws or any applicable Nevada law.

322.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. Claims against the Director-Defendants' joint tortfeasors—Defendants Hughes, Schrader, Willison, and Ackerson—have already survived a motion to dismiss in the Securities Class Action, where each of Defendants Hughes, Schrader, Willison, and Ackerson face a substantial likelihood of liability. As directors who oversaw the actions of Defendants Hughes, Schrader, Willison, and Ackerson during the

---

Director-Defendants along with Defendant Hughes, a primary interested wrongdoer who was not independent at that time given that he was CEO and that he faces a substantial likelihood of liability in the Securities Class Action. Thus, Plaintiffs' burden would be even easier, as Plaintiffs would need to demonstrate demand futility as to four of eight directors at that time, and the analysis for each of Defendants Budde, Chess, Clark, Dedo, DeMott, Mader, and Samuels would remain largely the same.

Relevant Period, and who served alongside Defendant Hughes who as CEO was also a member of the Board during the Relevant Period, the Director-Defendants face a substantial likelihood of liability for having engaged in and permitted the same scheme to issue false and misleading statements to the investing public, while five of them engaged in insider sales. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

323.   In addition, given that the Company's manufacture and sale of electric vehicles constitutes the Company's primary business, and the contemplated size of the USPS NGDV contract would easily have been the largest contract the Company was party to—with Defendant Schrader himself calling it "transformative"—the misconduct involved the Company's core operations. Indeed, as noted above, Defendant Schrader described "the post office" aspect of Workhorse's business "as the cake on the icing, because it's so big." Thus, the Directors-Defendants' knowledge, to the extent not already demonstrated, may also be inferred. *See Pfeiffer v. Toll*, 989 A.2d 683, 693 (Del. Ch. 2010) (applying core operations doctrine in a derivative action and holding that it would have been futile for plaintiff to have made a pre-suit demand on board of directors). *See also In Re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188 at *13 (Del. Ch. Oct. 1, 2019) (finding demand futility where Board failed to exercise adequate oversight over critical operations) ("To be sure, even in this context, *Caremark* does not demand omniscience. But it does demand a 'good faith effort to implement an oversight system and then monitor it.' This entails a sensitivity to 'compliance issue[s] intrinsically critical to the company[ ].'" (footnote omitted)). Here, all seven Director-Defendants knew, or were highly reckless in not knowing, that the Company's public statements regarding its likelihood of securing the USPS contract, manufacturing capabilities, and order backlog, were false and misleading, and yet failed to act on this information, damaging the Company. Thus, the Director-Defendants face a substantial

likelihood of liability, and demand as to them is excused.

324. Additional reasons that demand on Defendant Budde is futile follow. Defendant Budde has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee. Defendant Budde has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $1.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, the Company obtains its property and casualty insurance through AssuredPartners NL, LLC ("Assured"), an indirect subsidiary of AssuredPartners, Inc., where Defendant Budde is employed as Eastern Regions Chief Financial Officer. The Company paid Assured approximately $121,000 and $86,000 in brokerage fees for the years ended December 31, 2020, and 2019, respectively. Finally, he solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, too, Defendant Budde breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

325. Additional reasons that demand on Defendant Chess is futile follow. Defendant Chess has served as a Company director since October 2013 and as Chairman of the Board since December 2015. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Chess has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to

monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $1.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Finally, he solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, too, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

326. Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Clark has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Finally, he solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, too, Defendant Clark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

327. Additional reasons that demand on Defendant Dedo is futile follow. Defendant Dedo has served as a Company director since May 2020. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Dedo has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the

Verified Consolidated Shareholder Derivative Complaint

scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to her reelection to the Board. For these reasons, too, Defendant Dedo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

328.   Additional reasons that demand on Defendant DeMott is futile follow. Defendant DeMott has served as a Company director since February 2015, and also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant DeMott has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $2.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, he solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, too, Defendant DeMott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

329.   Additional reasons that demand on Defendant Mader is futile follow. Defendant Mader has served as a Company director since May 2020. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Mader has received and continues to receive compensation for her role as a director as described herein. As a trusted Company

director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sale before the fraud was exposed, which yielded $240,000 in proceeds, demonstrates her motive in facilitating and participating in the fraud. Moreover, she solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to her reelection to the Board. For these reasons, too, Defendant Mader breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

330.   Additional reasons that demand on Defendant Samuels is futile follow. Defendant Samuels has served as a Company director since December 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Samuels has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $24.5 million in proceeds—the largest amount of any Director-Defendant—demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Samuels solicited the 2020 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, too, Defendant Samuels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

331. Additional reasons that demand on nonparty Dauch is futile follow. Nonparty Dauch is CEO of the Company, which provides him with his principal occupation and lucrative compensation. As the Company therefore admits, he is not an independent director. Given that he depends on the Director-Defendants, who constitute a majority of the Board, for his continued employment with the Company, he is unable to impartially and independently consider a demand to investigate and bring an action against them. Thus, demand upon him is futile and, therefore, excused.

332. Additional reasons that demand on the Board is futile follow.

333. As described above, five of the Director-Defendants, constituting a majority of the Demand Board, directly engaged in insider trading, in violation of federal law. Director-Defendants Budde, Chess, DeMott, Mader, and Samuels engaged in lucrative insider sales based on material nonpublic information, netting proceeds of approximately $30.3 million when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand on a majority of board members on the Demand Board in this case is futile, and thus excused.

334. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Chess and Mader worked at General Motors together from 1994 to 2010. Defendant Chess worked at General Motors from 1980 until 2017 in various roles including Chief Manufacturing Engineer and Executive Director of Stamping and Assembly as well as a Vehicle Line Executive. Defendant Mader worked at General Motors from 1994 through 2010 in various positions including as a Plant Manager of various General Motors assembly operations. Moreover, Defendants Budde, Chess, DeMott, and Samuels, have served on the Board together for six or more years. These conflicts of interest precluded Defendants Budde, Chess, DeMott, Mader, and Samuels from adequately monitoring the Company's operations and internal controls and

calling into question each other's and the remaining Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

335.    Defendants Budde, Clark, Dedo, and Samuels served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by failing to provide adequate oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics and failing to establish adequate procedures to uncover the misconduct at issue. In so doing, the Audit Committee Defendants caused or permitted the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

336.    The Director-Defendants violated Workhorse's Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, and failing to report the same. Moreover, five of the Director-Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to act with honesty and candor, avoid conflicts of interest, and comply with laws and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

337.    Workhorse has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful

conduct to attempt to recover for Workhorse any part of the damages Workhorse suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

338.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As each of the Director-Defendants, and therefore a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

339.   The acts complained of herein constitute violations of fiduciary duties owed by Workhorse's officers and directors, and these acts are incapable of ratification.

340.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Workhorse. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Workhorse, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

341. If there is no directors' and officers' liability insurance, then the Directors will not cause Workhorse to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

342. In its latest Annual Report on Form 10-K filed on March 22, 2022 ("2022 10-K") at Note 18, in its Notes to Financial Statements, Workhorse' Board caused Workhorse to state, regarding the shareholder derivative complaints, including this action:

> Although, these claims purport to seek recovery on behalf of the Company, the Company will incur certain expenses due to indemnification and advancement obligations with respect to the Defendants. The Company understands that Defendants believe this action is without merit and intends to support them as they pursue all legal avenues to defend themselves fully.

2022 10-K at page F-29.

343. The 2022 10-K was signed by directors R. Dauch, R. Ginnan, G. Ackerson, R. Chess, G. Buddle, H.B. Samuels, H. DeMott, M. Clark, P. Mader, J. Dedo and W. Quigley. Six of these eleven directors are named insider trading defendants in this suit, and Dedo is also named as a defendant herein. A super majority of the current Board are named as insider traders herein and indeed all current directors have already decided to defend all Defendants.

344. Thus, for all the reasons set forth above, the Directors, and if not all of them at least five Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CLAIM

**Against Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and**

**Samuels for Violations of Section 14(a) of the Exchange Act**

345.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

346.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

347.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

348.   Under the direction and watch of Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels, the 2020 Proxy Statement failed to disclose that: (1) despite assertions to the contrary, the Code of Ethics did not apply "to all of our directors, officers and employees," or else could be flouted by them with impunity, as evidenced by the numerous false and misleading statements and other violations of the Code of Ethics engaged in by the Individual Defendants; (2) contrary to the 2020 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual

Verified Consolidated Shareholder Derivative Complaint

Defendants on the Board were breaching their fiduciary duties; and (3) the Company's performance-based compensation structure was not "reward[ing] each executive based on . . . performance and [] incentiviz[ing] such executives to drive the organization's current growth" but was instead rewarding the Individual Defendants who were breaching their fiduciary duties and improperly increasing their unjust compensation by inflating the Company's performance through the issuance of the false and misleading statements described herein.

349.    Under the direction and watch of Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels, the 2020 Proxy Statement also failed to disclose that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 1,800 vehicles by the end of 2021; (3) the thousands of supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles; and (4) the Company failed to maintain internal controls.

350.    In the exercise of reasonable care, Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels and the approval of the Issuance Proposal.

351.    The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the approval of the Issuance Proposal and the election of Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels, which allowed them to continue to receive unjust director compensation and to breach their fiduciary duties to Workhorse.

352.  The Company was damaged as a result of the Defendants Budde, Chess, Clark, Dedo, DeMott, Hughes, Mader, and Samuels's material misrepresentations and omissions in the 2020 Proxy Statement. These Defendants' compensation should be cancelled and/or returned to Workhorse.

353.  Plaintiffs on behalf of Workhorse have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

354.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

355.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Workhorse's business and affairs.

356.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

357.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Workhorse.

358.  In breach of their fiduciary duties owed to Workhorse, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020 or 1,800 vehicles by the end of 2021; (3) the thousands of supposed orders in the Company's backlog did not represent binding commitments to purchase vehicles; and (4) the Company failed to maintain

internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

359.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

360.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

361.   In yet further breach of their fiduciary duties, during the Relevant Period, eleven of the Individual Defendants, including a majority of the Demand Board, engaged in lucrative insider sales, netting proceeds of approximately $61.4 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

362.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

363.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for

Verified Consolidated Shareholder Derivative Complaint

the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

364.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

365.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Workhorse has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

366.   Plaintiffs on behalf of Workhorse have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

367.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

368.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Workhorse.

369.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Workhorse that was tied to the performance or artificially inflated

Verified Consolidated Shareholder Derivative Complaint

valuation of Workhorse, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

370.  Plaintiffs, as shareholders and representatives of Workhorse, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any severance payment and performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

371.  Plaintiffs on behalf of Workhorse have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

372.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

373.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Workhorse in a manner consistent with the operations of a publicly-held corporation.

374.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Workhorse has sustained and will continue to sustain significant damages.

375.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

376.  Plaintiffs on behalf of Workhorse have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

377.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

Verified Consolidated Shareholder Derivative Complaint

378.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as it is doing in the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

379.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

380.   Plaintiffs on behalf of Workhorse have no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Hughes, Schrader, Willison, and Ackerson for Contribution Under Sections 10(b) and 21D of the Exchange Act**

381.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

382.   Workhorse, along with Defendants Hughes, Schrader, Willison, and Ackerson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hughes's, Schrader's, Willison's, and Ackerson's willful and/or reckless violations of their obligations as officers and/or directors of Workhorse.

383.   Defendants Hughes, Schrader, Willison, and Ackerson, because of their positions of control and authority as officers and/or directors of Workhorse, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Workhorse, including the wrongful acts complained of herein and in the Securities Class Action.

Verified Consolidated Shareholder Derivative Complaint

384.   Accordingly, Defendants Hughes, Schrader, Willison, and Ackerson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

385.   As such, Workhorse is entitled to receive all appropriate contribution or indemnification from Defendants Hughes, Schrader, Willison, and Ackerson.

## **PRAYER FOR RELIEF**

386.   FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiffs may maintain this action on behalf of Workhorse, and that Plaintiffs are adequate representatives of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Workhorse;

(c)   Determining and awarding to Workhorse the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Workhorse and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Workhorse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Workhorse to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

4. a proposal to ensure effective oversight and regulation of insider trading.

(f)     Voiding and/or cancelling all stock and option awards to the Director-Defendants awarded during the Relevant Period, including any awards made in 2022 for purported services undertaken in 2020 and/or 2021.

(e)     Awarding Workhorse restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: April 18, 2022            Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>/s/ Robert C. Moest</u>
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown

105
Verified Consolidated Shareholder Derivative Complaint

767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, SBN 219683
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**SQUITIERI & FEARON, LLP**
Lee Squitieri
32 East 57th Street, 12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: Lee@SFclasslaw.com

*Co-Lead Counsel for Plaintiffs*

Verified Consolidated Shareholder Derivative Complaint

## **VERIFICATION**

I, Barry Caruso am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 4/13/2022 _____, 2022.

Barry Caruso

## **VERIFICATION**

I, Mark Kistenmacher am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of APRIL , 2022.

Mark Kistenmacher